E-FILED
Wednesday, 09 August, 2017 04:07:43 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JOSEPH SUNDLING,

                Plaintiff,

vs.

JAMES DIMAS, ANDERSON FREEMAN, SHARON COLEMAN,
GREG SCOTT, CHRISTOPHER CLAYTON, JOSEPH HANKINS,
WANDA PENNOCK, DAVE BIERMAN, MICHAEL MADIGAN,
LISA MADIGAN, JOHN SULLIVAN, JOELLE MARASCO,
DEBRA SMILEY-BLOMGREN, LIBERTY HEALTH Inc.,
SHAN JUMPER, SHARLENE CARRAWAY, WEXFORD HEALTH
SOURCES, Inc., DAVID SUIRE, RICHARD TRAVIS,
KIMBERLY WEITL, STEVE GASKELL, ARAMARK
CORRECTIONAL FOOD SERVICES and various
John/Jane Doe individuals to be later named,
MICHAEL BEDNARZ,
                Defendants.

Case No._____.

CIVIL RIGHTS COMPLAINT FOR
DECLARATORY, INJUNCTIVE,
PUNITIVE AND COMPENSATORY
DAMAGES.

JURY TRIAL REQUESTED

## CIVIL RIGHTS COMPLAINT

Now comes the plaintiff, pursuant to 42 U.S.C. §1983, and
he alleges civil rights violations against the defendants who,
while acting under color of state law, have imposed punitive
conditions of confinement upon him that are illegal and are
unconstitutional because plaintiff is a civilian patient/detained
person not held for criminal or punitive purposes. The plaintiff
claims and alleges that each defendant, individually and collectively,
has created a secondary Illinois prison system under the guise of
purported "civil" justification but in reality has imposed punitive,
maximum security prison conditions of confinement on plaintiff that
are not logically nor rationally related to the purpose for which
he is confined.

Each defendant has violated the plaintiffs' Federal Constitutional
Right not to be imprisoned and punished without Due Process of Law.
In addition to the federal claims below, plaintiff most respectfully
requests that this Court invoke its inherent statutory and pendent

and supplemental jurisdiction to determine the state law claims
that are implicit in the civil rights claims alleged below.

## INTRODUCTORY FACTUAL ALLEGATIONS

1. The plaintiff is a citizen of the United States of America
and of the State of Illinois. As such, he is guaranteed the rights,
priviliges and immunities as are afforded him by the United States
Constitution as well as the laws, statutes and common law
protections of the State of Illinois. As such, he cannot be lawfully
imprisoned under conditions of confinement that punish him, without
Due Process of Law and, without being convicted of a crime and
sentenced by a court to a penal institution.

2. The plaintiff is held by the State of Illinois under an
order of "civil" commitment for "treatment" purposes pursuant to
the Illinois Sexually Violent Persons Act (hereafter, the "SVPCA"
or "the Act"). 725 ILCS §207/1 et seq. At all times relevent to
this complaint, plaintiff has been held at the Illinois Department
of Human Services "Treatment and Detention Facility" (hereafter,
"the TDF") located in Rushville, Illinois.

3. Despite the Act's requirement that it is "civil in nature"
(725 ILCS §207/20) and that persons under the Act must be held
under the "least restrictive" conditions of confinement, 725 ILCS
§207/40(b)(2), the TDF imposes maximum security prison conditions
of confinement on the plaintiff. This fact is beyond dispute and
has been admitted by the Office of General Counsel for the Illinois
Department of Human Services (hereafter "DHS"). In fact, in an e-mail
from DHS General Counsel dated June 2, 2015, DHS described the TDF as;

> "The Rushville TDF is an Illinois Department of Corrections'
> maximum security facility that is used to house IDOC inmates
> who are now committed to IDHS' custody under the Sexually
> violent Persons Commitment Act (725 ILCS 207/1 et seq.)."

A copy of this e-mail is attached to this Complaint. (emphasis)

2

4. Each of the named defendants in this Complaint have individually and collectively played significant parts in violating the plaintiffs' rights by creating a parallel prison system that is illegal, unconstitutional and not logically nor rationally related to the purpose for which the plaintiff is "civilly" confined.

5. The plaintiff will prove at trial, that not only is the "least restrictive" requirement of the state statute under which he is confined, routinely ignored by the defendants, but that each of the defendants knowingly, deliberately and with malice aforethought has punished the plaintiff by forcing him to live in a maximum security prison; under maximum security prison rules and, by inflicting upon him punitive conditions that are designed to unlawfully punish plaintiff, in the absence of any valid criminal conviction. (SEE AFFIDAVIT OF PLAINTIFF-ATTACHED HERETO)

6. The plaintiff will prove at trial, that Defendants SCOTT, CLAYTON, HANKINS, PENNOCK, DIMAS, COLEMAN and various DHS and TDF Defendants, individually and collectively, while working in concert with LIBERTY HEALTH Inc., and defendant SHAN JUMPER, have created an illegal prison enviornment that punishes the plaintiff without due process of law, by; (a) Creating and imposing a deliberately toxic, hopeless non-therapeutic, prison enviornment at TDF; (b) where there is a group of guards, also known as "STA's" who are allowed to threaten, torment, chastise, disparage, humiliate, write false charges against, sustaining those charges with no grievance recourse; where these guards are allowed to retalliate against the Plaintiff for filing complaints against abusive guards with the approval, aquiescense and assistance of the TDF Administration;

and, (c) where Defendants SCOTT, CLAYTON, HANKINS, PENNOCK, JUMPER and various John/Jane Doe Defendants know that there is a group of "STAs'" who regularly and routinely harrass, annoy, chastize, bait, falsely charge, violently assault, destroy personal property of and otherwise "get away with" illegal acts that are contrary to DHS policy and TDF written rules, and that these defendants directly approve of or turn a deliberate blind eye at the repeated misconduct and abuses of these staff, and, where (d) in many instances, these STA's file false charges against the TDF residents including the plaintiff, that are sustained and approved by Defendants HANKINS, JUMPER, PENNOCK and other JOHN/JANE DOE defendants to impose unjust punishment upon plaintiff within the TDF and, where these false charges are later used as "evidence to sustain extensions of imprisonment" by Defendants who are DHS "state evaluators" such as Defendants SUIRE, TRAVIS, WEITL, GASKELL and other JOHN/JANE DOE defendants, who, on behalf of DHS and the TDF, submit written psychological reports to Defendants LISA MADIGAN, MARASCO, SMILEY-BLOMGREN and various JOHN/JANE DOE Assistant Attorneys General who advocate that purported bad behavior justifies extended civil detention; (e) that the STA's with an established history of abusive and improper conduct at the TDF, harming the physical and mental health of the plaintiff, include, but are not limited to STA-I's KERR, ORRILL, CHENOWETH, WEIR, ROSE, POSEY, JACKSON, MAYS, MOODY, and numerous others, as well as STA-II's TRAVIS SMITH, KAREN SMITH, ANDREA COBB, JAVIER PEREZ, GARY KULHAN and various others, and STA-IV's D. BIERMAN, E. BIERMAN, C. PARSONS, A. CLARK, W. PENNOCK, D. LUCAS, and numerous others; (f) The TDF has a tactical assault squad of STA's who dress in riot gear and attack TDF patients. It is important to emphasize that the TDF is the only DHS Facility

4

that has such a "Tactical Assault" team of guards, and; (g) the TDF
has a prison-like segregation unit, labeled as "Special Management"
where TDF patients are placed for punishment purposes, and (h) that
civilians held at the TDF are often punished by being forced to wear
a yellow prison jumpsuit as punishment for rule infractions; (i) that
while  under these punishment conditions, are forced to be subjected
to handcuffing and waistchaining any time they are moved off their
housing unit (e.g., to health care etc.) while under security escort,
and; (j) any time the plaintiff (or any other TDF "patient") is taken
out of the TDF for court appearances or medical appointments, he is
placed in mechanical restraints in a manner identical to the restraints
applied to IDOC inmates while out of the prison on "writ status",and;
(k) while forced to wear handcuffs attached to a waist chain as well
as the notorious "Black Box" torture device, and leg irons, the
plaintiff is transported by TDF Security staff in a van set up in
a manner identical to IDOC prison transport vans, and; (l) on numerous
and repeated occasions, plaintiff has been forced to remain in these
restraints for as long as 12 to 14 hours, and; (m) while out on
"writ status" and while restrained as described above, the plaintiff
(and other TDF "patients") must use plastic bottles to urinate in
during long road trips because, TDF security staff, on orders from
Defendants SCOTT, CLAYTON, D. BIERMAN, PARSONS, HANKINS, PENNOCK
and other JOHN/JANE DOE TDF defendants and as approved by DHS
Defendants DIMAS and COLEMAN (and other JOHN/JANE DOE DHS Defendants),
and; (n) that the TDF "policy" is that TDF staff can make stops at
gas stations and restraunts to use washrooms and, to obtain food
items (that they often use to taunt plaintiff with by eating it in
front of plaintiff, while plaintiff is provided a "sack lunch"
consisting of soggy sandwiches that most TDF staff refuse to consume),

and; (o) the Defendants "transport policies" force plaintiff, and
other TDF "patients" to expose their genitals, in front of other
"patients", in front of TDF staff (often including female STA's),
in order to attempt to urinate into these plastic bottles while the
van is in motion. On numerous and repeated occasions, plaintiff has
been forced to remain in TDF vans after other "patients" have
"missed" the bottle and urine has splashed on the interior of the
van: and; (p) on numerous occasions, TDF "patients" have been denied
use of washroom facilities on very long trips resulting in them
deficating on themselves, and; (q) plaintiff and others TDF "patients"
are forced to endure the putrid smell of urine and feces and, are
faced with the decision to eat the soggy sandwiches under these
conditions, or, to simply go hungry; (r) that the TDF Grievance
Process, as administered by LIBERTY staff working at the TDF and,
ultimately finalized at the TDF-level by Defendant SCOTT, is an
exercise in futility thus forcing litigation, such as this lawsuit,
and,  when appeals are allowed to reach Defendant COLEMAN from
grievance denials made by Defendant SCOTT, the appeal process
is equally futile, and; (s) Due Process denials at Behavior Committee
proceedings, such as refusal to call or interview witnesses, "carpet
bombing" numerous charges making it impossible for plaintiff to know
what he has been charged with or to defend against charges; the
failure to follow the procedures outlined in the relevent Administrative
Code (59 Il.Ad.Cd. 299.00 et seq.), are ignored by Defendant SCOTT
after being regularly committed by Defendants JUMPER, HANKINS, PENNOCK
and various JOHN/JANE DOE DHS and LIBERTY Defendants and, contrary to
Title 59, grievances that are denied by SCOTT regarding Behavior
Committee due process denials "cannot be appealed" to Defendants
COLEMAN or DIMAS, and; (t) the TDF population is about 565 "patients"

of which **over 300 are diabetics**, which is a number steadily increasing and, is drastically inflated statistically. Defendants WEXFORD HEALTH SOURCES and various WEXFORD JOHN/JANE DOE defendants, as well as Defendant LIBERTY HEALTH Inc., Defendant JUMPER, as well as numerous LIBERTY JOHN/JANE DOE defendants, in conjunction with Defendants SCOTT, DIMAS and COLEMAN have allowed Defendant ARAMARK CORRECTIONAL SERVICES on a long term basis, to feed TDF patients low quality, high sugar, empty carbohydrate meals with processed, cheap meats, despite the state contract requiring ARAMARK to serve "Grade A" food products, and; (u) in addition to all of the above toxic, prison-like conditions of confinement imposed upon plaintiff, the plaintiff is forced to live under prison rules that are with limited exception, identical to the rules that IDOC prison inmates have imposed upon them. Compare 20 Ill.Admin.Code Part 504-A (IDOC Rules) to 59 Ill.Admin.Code Part 299.00, Appendix-A. The TDF (Defendants SCOTT, CLAYTON, JUMPER, LIBERTY, HANKINS, PENNOCK, et al.) also enforce an additional laundry list of "facility rules" outlined in the "TDF Resident Handbook", and; (v) the physical plant layout of the TDF is identical to a maximum security prison that includes (but not limited to) the following; outter perimeter double fencing with deadly concertina wire at the tops and bottoms; over 300 constantly monitored and recorded video cameras; internal and external security patrols; no free movement within the TDF; forced double celling of "patients" in cells designed to house a single juvenile; extended periods of time confined in the prison cells with another individual the state claims is an "out of control sexually violent predator"; constant, invasive searches and seizures of personal property that has been lawfully obtained and is then seized ("stolen") by TDF staff without due process of law; the saturation by TDF staff of the TDF with pornography.smuggled in to TDF "patients" used to justify, perpetuate and secure jobs;

7

a "part-time" Dentist not sufficient to meet the health care need
of over 550 "patients"; the regular, widely known defacto policy
of retalliation against TDF "patients" who utilize the grievance
procedure claiming misconduct by TDF staff or who file lawsuits
against the TDF defendants. The Retalliation is so wide-spread and
commonly known and understood that it affects both "patients" as
well as staff members who "stand up for patients" when impropriety
or staff misconduct is witnesses; the day to day consistent in-
consistency in rule application and enforcement (e.g., what is
perfectly legal on a Monday, can result in severe punishment on
Wednesday); (v) non-therapeutic decision-making at every level
where "Security" wags the "therapeutic tail" and, where TDF staff
(including Defendants SCOTT, CLAYTON, HANKINS, PENNOCK, D. BIERMAN,
E. BIERMAN, PARSONS and numerous other TDF JOHN/JANE DOE Defendants
have absolutely no qualifications, education nor licensure to make
any form of "professional judgment" following a "therapeutic" and
non-punitive model, and, where Defendant JUMPER and his LIBERTY
Defendant (JOHN/JANE DOE) TDF staff act in complete concert with
"Security" staff and, ignore the mandate of "least restrictive"
or "therapeutic" decision-making; (w) where the TDF has created
a model that is toxic, frustrating and in fact causes mental and
physical health atrophy, resulting in mental illness, physical
illness and maladative behavior, the "DHS Evaluators", Defendants
SUIRE, TRAVIS, WEITL, GASKELL and other JOHN/JANE DOE evaluators,
regularly and routinely, compound, further and exascerbate the
illegal manner in which the TDF program operates by submitting
biased psychological reports, following the agendas of the DHS,
the TDF and the LIBERTY Defendants and ignoring repeated examples
of psychological decomposition, physical illness; faulty rule
violation charges and use antiquated facts or risk tools to knowingly

8

extend, further and purportedly justify continued extension of
incarceration, in most cases, despite the complete absence of
severe or even moderate symptomology and in numerous cases, the
complete absence of current symptoms of mental illness; (x) that
Defendants MADIGAN, MARASCO and SMILEY-BLOMGREN, along with other
JOHN/JANE DOE defendants, have for over a decade, caused the
unjustified civil imprisonment of hundreds of United States
citizens based upon nothing more than the speculative, unsupported
"opinions" of state-employed psychologists who render diagnostic
conclusions that they are not licensed nor qualified to give,
e.g., medical conditions such as "acquired or "congenital" mental
disorders. (an acquired mental disorder is a medical condition
that can be caused by, among other things, tramautic brain injury;
heavy metals in the bloodstream; drug interaction; oxygen deprivation;
post-concussive brain damage or "Chronic Taumatic Encepholopathy" and;
a congenital mental illness is a medical condition occurring before
birth. Both are medical conditions that a non-medical doctor is in
no way qualified, capable nor licensed to diagnose) and, these
defendants have knowingly engaged in conspiratorial, deliberate
conduct where, in concert with the DHS Evaluator Defendants, have
created a templated method of rendering opinions slanted in favor
of the state so as to deny American citizens, including the Plaintiff,
his constitutionally guaranteed right to liberty; (y) that in totality,
all named defendants as well as numerous JOHN/JANE DOE Defendants have
created a secondary, punitive, prison system in Illinois under the
thin, transparent veil of "civil", "therapeutic" "treatment" oriented
non-punitive confinement; (z) that the claims and allegations must be
considered and viewed in their connective totality and participation
of each of the named and JOHN/JANE DOE defendants.

**ADDITIONAL INTRODUCTORY FACTUAL ALLEGATIONS**

1). That involuntary civil commitment under the SVPCA must be predicated upon a mental disorder so serious that it causes a "special and serious" lack of control over sexual violence.

2). That the Plaintiff has been committed absent any evidence that he suffers from a lack of control.

3). The Plaintiff does not and never has lacked control over his conduct or behavior.

4). That both United States Supreme Court decisions and the Illinois Supreme Court's <u>Samuelson</u> decision require that persons cannot be involuntarily detained based "on past conduct".

5). That Illinois Courts as well as SVPCA prosecutors have described the SVPCA as an act "that allows for the extension of a criminal defendants incarceration".

6). That the SVPCA has created what is tantamount to an industrialized, privately motivated, financially based prison system that is holding United States citizens captive, with the assistance and approval of the Illinois officials named as defendants in this case. ***A/

7). The SVPCA and the TDF have been and are violating federal constitutional prohibitions, including "slavery".

8). That the Plaintiff has no adequate remedy at law within the Illinois Court system.

9). The Defendants, including Defendants MADIGAN, MARASCO, SMILEY-BLOMGREN, and numerous JOHN/JANE DOE defendants have knowingly and deliberately created a templated method of prosecution of the plaintiff and others under the SVPCA that utilizes purported scientific

---

***A/. Plaintiff begs this Honorable Courts' indulgence as to the length of this Complaint. The need for completeness is based upon the connectivity of all aspects of the SVPCA, the TDF and overall violation of plaintiff's civil and federal constitutional rights. Each count is leveled against each defendant who, have all individually and collectively participated in these violations both on individual and collective basis. (SEE PLAINTIFF'S AFFIDAVIT, attached hereto)

"evidence" that they have "sold" to the Illinois Courts despite
the inherent lack of actual credibility that said evidence actually
has. As will be explained more fully below, the statutory and
constitutionally mandated "elements" that Lisa Madigan, Joelle Marasco
and Debra Smiley-Blomgren (and their assistants in the SVP Bureau) allege,
have actually never been properly proven beyond a reasonable doubt
in a single prosecution under the SVPCA.

## THE RELEVENT LEGAL STANDARDS

10). Pursuant to the Illinois SVPCA, commitment is possible
only if the three essential elements outlined in the Act are proven
beyond a reasonable doubt. Those three essential elements are that
(a) the respondent has been convicted  of a sexually violent offense,
(b) that the respondent has a mental disorder and, (c) that the
mental disorder creates a substantial probability that the person
will engage in acts of sexual violence. (see 725 ILCS §207/5(f);
also see In re Det. of Fields, 2014 (1st Dist.) 381 Ill.Dec. 423,
10 N.E.3d 832 and, In re Det, of Butler, App.1st Dist. 2013, 374
Ill.Dec. 826, 996 N.E.2d 273.)

11). The SVPCA defines mental disorder "as a congenital or
acquired condition" that affects the emotional or volitional capacity
of the person that pre-disposes the person to engage in acts of
sexual violence.

12). State and federal caselaw has long recognized that civil
confinement is a "massive" curtailment of liberty. Vitek v. Jones,
445 U.S. 480, 491-92 (1980); Addington v. Texas, 441 U.S. 418, 425
(1979)("[C]ivil commitment for any purpose constitutes a significant
deprivation of liberty that requires due process protection."}.
Substantive due process requires that civil committees may be confined
only if they are both mentally ill and pose a substantial danger

to the public as a result of that mental illness. <u>Foucha v. Louisiana</u>, 504 U.S. 71, 77(19991)("Even if the initial commitment was permissable," a civil commitment may not "constitutionally continue after that basis no longer exist[s].") Additionally, "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." <u>Zinermon v. Burch</u>, 494 U.S. 113, 125 (1990).

13). The Illinois Attorney General's Office has worked with Dr. Michael Bednarz to create the illusion that the process by which commitments are obtained, are medically sound, accurate and justified. Under closer scrutiny, the methods used to obtain civil commitments under the SVPCA are in fact arbitrary, foundationless and in the absence of legitimate medical justification, are nothing more than an unconstitutional extension of an individuals incarceration, after having served a fully completed prison sentence.

The reasons for this assertion are many, but in summary;

> a). Nearly all evaluators working with the Attorney General's SVP Bureau, are not medical doctors but instead, are "Psy.D" or Ph.D" level psychologists who, by the limitations of their education and licensure, <u>are not qualified to diagnose or offer expert medical testimony about "congenital" mental abnormalities</u>, and;
>
> b). These non-medical doctors also lack education and licensure to diagnose or offer expert testimony about "acquired" mental abnormalities. (For example, brain injuries can be caused by trauma; drug interaction, poisoning, oxygen deprivation, drug abuse, malnutrition, heavy metals being introduced into the human body and, numerous other causations), and;     **2/**

---

2/. Another widely known "acquired" condition making headlines of late is "C.T.E.", or "Chronic Traumatic Encephalopathy". This brain disorder is known as "post concussive" brain disorder. Yet another "acquired" or post-birth mental disorder that cannot be diagnosed by non-medical doctors. Only M.D.'s who review results of brain imaging scans can make such a diagnosis. Psychologists are engaging in unsupported, rank speculation by claiming in SVPCA prosecutions that plaintiff's conduct was the product of congenital or acquired brain/mental disorder.

The mental disorders that pro-prosecution
psychologists are alleging in SVPCA cases, are
taken exclusively from the American Psychiatric
Association's Diagnostic and Statistical Manual
of Mental Disorders, 5th Edition.
Nowhere in the DSM-5, does that manual state
that the sexual mental disorders being alleged
by psychologists working for the State (DHS),
have a congenital or an acquired origin.
As such, the Illinois Attorney General's SVP Bureau,
headed by AAG's Marasco and Smiley-Blomgren, are
deliberately causing the loss of liberty based upon
the unqualified and unsupported testimony of
non-medical doctors whose "expert opinion" that
is entirely devoid of medical or scientific support,
and;

d). The fallacy of the plaintiff's confinement being
justified where its purpose is "for treatment and
not punishment" is demonstrated by the fact that
under the mandated evaluation requirements that
are outlined under the Illinois Sex Offender
Management Boards "Elements of a Comprehensive"
Sex Offender specific evaluation, medical testing
neccesary for diagnosis is repeatedly indicated.
(see 20 Ill.Ad.Code §1905.240)
Medical testing has never been conducted on a single
respondent being held under the SVPCA.

   (1). Not only is medical testing essential for
        initial diagnosis but it is equally needed
        for treatment purposes...A brain blood flow
        obstruction; brain tumor, shift in the mid-
        line or other neurobiological infirmity
        that remains undetected negates any possibility
        of a favorable "treatment outcome"...

e). Not knowing the actual causes and causation(s) of
the mental disorders being alleged by the SVP Evaluators
and by the Illinois Attorney General's Office,
demonstrates yet another basis upon which plaintiff
assert that the processes are speculative, and not
medically based. The absence of this evidence also
makes it a medical impossibility to guage the severity
of the disorder being alleged. Accordingly, asserting
that plaintiffs suffer from a disorder so severe that
volitional control is impaired is nothing more than
unsupported, biased, purchased opinion, and;

13

f). In each prosecution under the SVPCA, the state-contracted defendant evaluators follow the diagnostic template that has been created, in part, by BEDNARZ and the Attorney General's Office. In each evaluation tendered by DHS contracted evaluators to the A/G's SVP Bureau and to the various circuit courts throughout the state, the 3rd element (that "as a result of the mental disorder, the person will engage in future acts of sexual violence")(§207/5(f)), is purportedly established by way of actuarial risk assessment tools known as "Static-99", "Static-99-R" (and other versions of the same instrument and, the "MnSost-R" (accronym for the Minnesota Sex Offenders Screening Tool-Revised).

1). By admission of DHS General Counsel; by admission of the creators of these instruments and; by admission of DHS contracted evaluators in sworn deposition testimony, <u>these actuarial risk assessments DO NOT DETECT THE PRESENCE OF, OR THE SEVERITY OF ANY MENTAL DISORDER:</u>

2). Where the SVPCA as well as numerous Illinois Appellate and Supreme Court cases, assessing SVPCA jurisprudence in this state have also confirmed that an essential element under the act is that <u>it must be the mental disorder that compels the "substantial probability"</u> of future acts of sexual violence, the plaintiff will prove at trial that DHS' evaluators, in collusion with the Illinois Attorney General, LISA MADIGAN and her "SVP Bureau", headed by AAG Marasco and her assistant, AAG Smiley-Blomgren, have created a body of SVPCA prosecutions and commitments that are founded, in part, on deliberately misrepresented scientific evidence;

3). In so doing, the DHS Evaluators, Illinois Attorney General's Office, SVP Bureau, Bednarz and other JOHN/JANE DOE defendants have systematically violated the common law, statutory and Constitutional rights of over 550 human beings that they have imprisoned on known, false, misleading evidence;

g). The templated SVPCA evaluations that form the basis of SVPCA prosecutions, as prepared by DHS evaluators, under the direction of Bednarz, mislead courts by use of the actuarial risk assessments mentioned above under sections of those reports captioned as "Issue of Risk". The Attorney General and her SVP Bureau, have created an non-existant statutory element as the terms "risk" or "recidivism" appear nowhere in the plain and ordinary language of the SVPCA. (see 725 ILCS §207/1 et seq.);

h). The DHS Evaluators, Illinois Attorney General and the AAG's in the SVP-Bureau, systematically and deliberately mislead courts and juries in SVPCA prosecutions that are in direct violation of the Illinois Supreme Court's ruling in In re Det. of Samuelson, 727 N.E.2d 228 (2000) by use of the actuarial risk assessments where those instruments, in addition to having no scientific relevence to detecting or measuring severity of mental disorders, are based entirely on historic, "static" facts that focus entirely on antiquated past conduct and have nothing whatsoever to do with assessing an SVPCA respondents current mental state and condition;

The Illinois Supreme Court in Samuelson made clear that "Involuntary confinement is permissible only where the defendant presently suffers from a mental disorder and the disorder creates a substantial probability that he will engage in acts of sexual violence in the future." Id. at 235. The Samuelson decision further held that a "defendant cannot be involuntarily committed based on past conduct." Id.. The court added that involuntary confinement is permitted only where the defendant is currently suffering from a mental abnormality or personality disorder and is likely to pose a future danger to the public." Id. at 235 (citing Kansas v. Hendricks, 521 U.S. 346, 369-71 (1991))(emphasis added). Additionally, "it has been held that an order of involuntary commitment meets statutory requirements only when the evidence, based on a current evaluation of defendant's conduct and state of mind, clearly establishes the need for inpatient care." People v, Jurisec, 766 N.E.2d 648, 657 (Ill. Sup. Ct. 2002).

To safeguard against the kind of prolonged involuntary commitment based solely on past criminal behavior warned against in Samuelson, the Illinois SVPCA requires periodic reexaminations (after the initial commitment) in order to determine whether the person's condition "has so changed since the most recent periodic reexamination... that he [] is no longer a sexually violent person."(725 ILCS §207/55(a)).

15

    i). The Illinois Attorney General, Lisa Madigan, her
SVP Bureau, headed by AAG's Marasco and Smiley-Blomgren,
(and implemented by various other JOHN/JANE DOE AAG's),
along with DHS, Bednarz and other individuals working
in conjunction with the foregoing, utilize the risk
assessments, again and again, year after year, while
being fully aware that these actuarial risk assessments,
have no way of being modified to assess a persons conduct,
current mental state, symptom presence or severity, or
the onset of relevent life changes, health issues or
even treatment progress;

    j). The Illinois Attorney General, Lisa Madigan, the
AAG's in the Attorney General's SVP Bureau, Bednarz
(who supervises and sets standards for DHS evaluators),
the DHS evaluators, are all committing the exact same
acts and conduct that were specifically addressed by
Federal Judge, The Honorable Donovan Frank when he
found this specific practice to be unconstitutional
in the "Finding of Fact, Conclusions of Law, and Order"
dated June 17, 2015 in Karsjens v. Jesson, 11-cv-03659,
U.S. District Court, Dist. of Minnesota;

    k). The Attorney General, Lisa Madigan, and her assistants
in the SVP Bureau, in fact filed pleadings in an
SVPCA prosecution where they specifically asserted
that "the issues in the underlying criminal case and
the current SVP case are identical and are both
concerned with whether the respondent committed rape."

    l). The Attorney General, Lisa Madigan, her assistants in
the SVP Bureau, Bednarz, DHS and other JOHN/JANE DOE
defendants, use the exact same fact patterns that
were used to criminally convict an SVPCA respondent
in the prior criminal case to automatically diagnose
and prosecute a purported current mental disorder,
for no reason other than to extend incarceration under
the guise of non-existant and futile "treatment";

The Illinois Supreme Court fully adopted the logic, law and

nomenclature of the U.S. Supreme Court's decision in Kansas v.

Hendricks, 521 U.S. 346 (1997) in its Samuelson decision.

Hendricks and Samuelson undeniably stand for the constitutional

rule of law where it held that a civil commitment statutory scheme

is permitted provided that an individual is not detained past the

time they are no longer dangerous or no longer have a mental illness

without rendering the statute punitive in purpose or effect as to

negate a legitimate nonpunitive civil objective. see Hendricks, 521

U.S. at 361-62. Thus, where, notwithstanding a "civil label," a

statutory scheme "is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" a court will reject a legislature's "manifest intent" to create a civil proceeding and "will consider the statute to have established criminal procedings for constitutional purposes." Id. at 361. Moreover, "[i]f the objective or purpose" of a civil commitment law is to provide treatment, "but the treatment provisions were adopted as a sham or mere pretext," such a scheme would indicate "the forbidden purpose to punish." Id. at 371 (Kennedy, J., concurring).

> m). Under the totality of circumstances, when combining the punitive conditions of confinement inflicted and imposed upon the non-criminal, entirely civilly held plaintiff and other civil detainees at the Rushville TDF, with the manner in which defendants obtain initial commitments and then cause those commitments to be extended, as detailed hereinabove and below, the laws, statutes and Constitutional protections guaranteed by the Federal Constitution have all not only been violated, but callously disregarded by the defendants;

> n). More men have died at the Rushville TDF and left in body bags than have been released through the sham treatment program conducted by Liberty and its staff (and furthered, compounded, protected, defended, amended and otherwise propogated by each listed defendant named in the caption of this lawsuit), and;

> o). Further demonstrating the punitive intent, nature and application of the Illinois SVPCA, and as known to certain of the defendants, plaintiff will prove by irrefutable evidence, that several civilly detained persons held at the Rushville TDF had criminal charges pending that ultimately lead to conviction and transfer to the Illinois Dept. of Corrections. This fact alone demonstrates that the TDF is a penal institution. Those persons who were criminally convicted were credited with the time spent at the Rushville TDF, deducted from their criminal sentences. (emphasis added).
> These irrefutable facts demonstrate on their face, that the Rushville TDF is recognized by the Courts of Illinois as a correctional facility, and

17

p). Additional evidence of the pretextuality of the
SVPCA, from initiation of the proceedings thru
disposition of initial commitment proceedings,
TDF confinement and annual Section §207/55
evaluations is demonstrated where numerous persons
held at the TDF, including some TDF civilian detainee's,
underwent years of "S.O.M.B." approved and sanctioned
sex offender treatment while in prison and serving
criminal sentences. DHS, DHS evaluators, Bednarz,
The Attorney General and her assistants, Liberty,
Shan Jumper and     Caraway, ignore, reject and
refuse "to count" the preceeding state provided
treatment. TDF residents who participated in years
of formal treatment while in IDOC, are told to
forget what they have learned and to start over,and;

   1). The extremely expensive treatment afforded to
   certain of the plaintiffs while in IDOC, paid
   for by Illinois taxpayers, is, for all intents
   and purposes, wasted and completely devalued;

   2). "If" treatment were truly the purpose of civil
   custody under the SVPCA, the treatment taken
   in IDOC would not be disregarded as it is. The
   long-standing policy of disregarding extensive
   IDOC treatment commitment, is demoralizing,
   frustrating and has the patients on what is
   tantamount to a "psychological roller-coaster";

   3). Extending the incarceration of SVPCA respondents
   is the actual motive behind defendant Lisa
   Madigan and her SVP-Bureau prosecution of
   persons held under the SVPCA;

q). Many TDF patients are elderly, infirm and suffer from
serious debilitation health conditions that render
them incapable of being considered "dangerous".
Individuals who have demonstrated decades of non-
violent, compliant conduct are held despite showing
no symptoms of sexually violent or volitionally
impaired behavior or thought processes.
Attorney General Madigan; AAG's Marasco and
Smiley-Blomgren, along with their subordinate
SVP-Bureau assistants, ignore the constitutional
prohibition holding "that a committed individual 'may
be held as long as he is both mentally ill and
dangerous'"Foucha, 504 U.S. at 77, quoting Jones,
463 U.S. at 68;

   1). Defendants Bednarz, Liberty, Wexford, Jumper,
   Caraway and Weitl, Suire, Travis, Gaskell,
   in concert with MARASCO, Smiley-Blomgren and other
   DHS evaluators all cause, participate, further,
   endorse, promulgate policy for or otherwise
   cause or allow the foregoing constitutional
   and statutory prohibitions to take place and,
   have done so for an extended period of time.

r). When TDF patients present significant grievances
to the attention of DHS defendants, including (but
not limited to) DIMAS, FREEMAN, BEDNARZ, SCOTT, COLEMAN,
HANKINS, LIBERTY, JUMPER, CARRAWAY, CLAYTON,
JOHN SULLIVAN, MICHAEL MADIGAN regarding all of
the above complained of facts, conditions, policies,
scientific or medical shortcomings covering the
manner in which diagnosis; risk assessments;
SVPCA prosecutions are conducted, each have turned
a blind eye and demonstrated a deliberately callous
and indifferent ignorance, thus casually approving
the illegal and unjustified wrongful imprisonment
of over 550 human beings;

s). The formal grievance process at the Rushville TDF
as promulgated in 59 Ill.Ad.Code §299.00(et seq.),.
and as administered by Liberty, Jumper, Caraway, COLEMAN,
Scott, Clayton, Dimas, Freeman, Bierman, Bednarz, SIMPSON
and other John/Jane Doe defendants, is an absolute
total exercise in futility. Valid concerns have
been repeatedly presented to the above defendants
over several years, concerning (but not limited to)
the TDF's failure to comply with Section §207/40(b)(2)
(least restrictive confinement statute); health care
and dietazy issues that are life threatening; the
manner in which treatment is conducted by Liberty;
diagnostic shortcomings where DHS evaluators have
used out-dated or obsolete reliance materials; or,
where DHS evaluators have falsified Section 55     ***B/
evaluations, and numerous significant other issues.

No relief has ever been granted a TDF patient by
the above named defendants,(on any substantive issue);

t). The TDF operates a prison-like disciplinary board,
known as "the Behavior Committee". This committee
acts as the TDF's quasi-judicial hearing board to
adjudicate alleged rule violations committed by
TDF patients. This Board operates under 59 Ill.
Admin.Code, §299.00, et seq.. The Behavior Committee
consists of DHS correctional Major, Joseph Hankins
and random Liberty staff, including defendants Jumper,
Caraway and various John/Jane Doe DHS and Liberty
staff; (Defendant PENNOCK took over Hankins position
in June of 2017);

u). Disregarding basic due process rights (e.g., the right
to have witnesses called; have video-tape reviewed etc)
the Behavior Committee imposes punishment upon the
plaintiff  in various forms, including segregation
confinement; prison jumpsuit as clothing; seizure of
property; infliction of the torture device known as
"the Black Box"; removal of privately owned property
rights on permanent basis' and numerous other forms
of punitive and non-therapeutic punishments;

---

***B/. Attached hereto, see TDF ATR Grievance No. 04-15-AR-0423 where Defendants
JUMPER and CARRAWAY recommend that these issues be "routed to counsel and the Courts
as they do not have "supervision over" the claims.

v). When completely false or embellished rule violations are proven before the Behavior Committee, the patient is found guilty regardless. In all cases where TDF patients are found to have violated DHS/TDF rules, those findings are later utilized by Liberty staff, DHS evaluators and the Illinois Attorney General's Office, SVP-Bureau, to justify lengthening the imprisonment of the plaintiffs (and proposed class members); (including Defendant PENNOCK, as well);

w). The DHS/TDF Grievance process and the TDF Behavior Committee are intertwined. At the TDF, no staff member would dare make a finding in favor of a patient and against any TDF staff member.

x). These committees are under the direct control of Defendants Scott, Clayton, Hankins, Bierman, Freeman, Liberty, Jumper, Caraway and various John/Jane Doe Defendants as well as Defendants Pennock and Coleman. The manner in which these functions operate are directly contrary to Title 59, Illinois Admin. Code, §299.00, et al.., and ignore Federal Law;

As a matter of state law, "to give validity to its findings and orders, an administrative agency must comply with the procedures and rules promulgated by the legislature." Rogano v. Civil Service Commission, (1980) 80 Ill.App.3d 523, 527, 35 Ill.Dec. 960, 963. The purpose of judicial review of an administrative agency's decision(s) is to keep the agency within its statutory grant of authority and thus guard the rights of the parties which are guaranteed by the [Illinois] constitution and statute. Id. at 80 Ill.App.3d at 527. "An Administrative Agency (such as IDHS) derives its power solely from the statute by which it was created. The failure to comply with a mandatory provision of a statute will render void the proceeding to which it relates." (see Illinois Power Co. v Illinois Pollution Control Bd., (1985) 137 Ill.App.3d 449, 452. Furthermore, such rules as are lawfully adopted by an administrative agency pursuant to statutory authority have the force of law and bind the agency to them. Little v. Civil Service Comm., (1985) 131 Ill.App.3d 848, 851, 86 Ill.Dec. 947, 949, 476 N.E.2d 448, 452.

20

The foregoing is "particularly true" when the agency's non-compliance

with its own rules prejudices one who is subject to the authority

of the agency. Stull v. Illinois D.C.F.S., (5th Dist. 1992) 239 Ill.

App.3d 325, 179 Ill.Dec. 954, 606 N.E.2d 786.

> y). The TDF Behavior Committee regularly and routinely
>     impose punishment upon patients that they cannot
>     legally nor lawfully punish; it regularly and
>     routinely validates charges, filed by DHS correctional
>     officers ("STA's") who have a widely known pattern
>     of filing false rule violations reports against
>     TDF patients, including the plaintiff. This pattern of
>     conduct is widely known to residents and staff at TDF and
>     named DHS/TDF/Liberty defendants are fully aware
>     will stand as justification for extended loss
>     of liberty/confinement at the TDF;
>
> z). The above A-Z summaries are literally the proverbial
>     "tip of the iceburg" of unthinkable, shocking and
>     completely illegal facts, conditions, policies,
>     methods, regular occurrances and routine operating
>     procedures at all levels of the SVPCA, as it is
>     administered, to the detriment, loss of liberty
>     and false imprisonment and punishment of plaintiff
>     that is not rationally nor logically related to the
>     purpose for which he (and other TDF detainees) are
>     in "civil custody" for.

### THEFT OF HONEST SERVICES; PHANTOM PROGRAMMING
### AND SHOCKINGLY HIGH SALARIES OF TDF EMPLOYEES

11). Plaintiffs can prove at trial, shocking conduct on the

part of TDF employees where they are on the taxpayers clock, doing

absolutely nothing remotely related to DHS/TDF duties. On a frequent

and regular basis, TDF correctional officers ("STA's") spend hours

sitting in front of TDF facility computers, playing video-games,

searching various dating and other websites and shopping.

12). Plaintiffs can prove at trial that on a frequent and

regular basis, TDF staff who are on facility grounds, "find places

to hide out" so they don't have to work. Others for example,

especially who are of the rankof "Sergeant, Captain or Major",

can sit and do nothing for hours, unchallenged.

13). Defendant Hankins has been observed, over the span of years, spending hours each week, standing by the South-Gym guard station where his friend, Officer Seymore is permanently assigned, where they are over-heard talking about fishing; hunting, politics, personal matters, their hatred for TDF patients and other topics unrelated to TDF function. Defendant Hankins is paid a salary that exceeds $100,000 annually. HANKINS retired in June of 2017.

14). Under former Security Director D. Sanders, on a frequent and regular basis, Defendants Bierman, Scott, Hankins and various other DHS/TDF staff would leave the TDF during the day, at times 3-days per week during summer months, to "play golf on the state's dime". These TDF employees were "on the clock" while playing golf.

15). On a frequent and regular basis, TDF correctional officers who take TDF patients out of the facility to attend court appearances or medical appointments, deliberately take travel routes that purposely lengthen and delay return to the facility in order to "milk the clock".

16). The correctional officers union, "A.F.S.C.M.E.", has negotiated a contract whereby, on information and belief, during what are designated as "super-holidays", they are paid triple their normal salary. There have been numerous occasions where six to eight guards have been observed "hanging out", not working, laughing, joking and ignoring TDF patients for hours at a time and then, falsify log books showing that "rounds" were made when they were not. Security camera hard drive evidence will verify the foregoing. Undetected assaults and fights are the norm at the TDF and are most often never even noted by staff .

22

17). Relevent to the issue of unjust enrichment, plaintiff must

disclose that pursuant to the Illinois Freedom of Information Act,

it has been determined that the following TDF staff members are

paid the following salaries;

| TDF EMPLOYEE NAME | POSITION TITLE | SALARY |
|---|---|---|
| MICHAEL BEDNARZ | Medical Admin 2 | $14,668.00 (monthly |
| Hughes Lochard | MD | $ 8,640.00 (bi-week |
| Abdi Tinwalla | MD | $299,999.96(annual) |
| Shan Jumper | Clinical Dir. | $126,009.00(annual) |
| Sharlene Caraway | Associate Clin. Dir. | $ 94,632.00(annual) |
| Amy Louck | Therapist | $ 86,787.00(annual) |
| Judy Roth | Therapist | $ 86,787.00(annual) |
| approx 20 Clinical staff | Therapists | $ 78,943.00  to- |
|  |  | $ 58,025.00(annual) |
| Joseph Hankins | Security Guard | $  9,033.00(monthly |
| Dave Biermann | Security Guard | $  5,764.00(monthly |
| Edwina Bierman | Security Guard | $  5,764.00(monthly |
| James Clayton | Security Chief | $  6,035.00(monthly |
| Jennifer Blaesing | "Public Service Adm." | $  9,033.00(monthly |
| Marie Durant | Security Guard | $  5,764.00(monthly |
| Ronald Hamann | Maintenance man | $  8,371.14(monthly |
| Sarah Dodds | Commissary supervisor | $  4,374.00(monthly |
| Cynthia Dougherty | Security Guard | $  5,543.00(monthly |
| Amy Clark | Security Guard | $  5,542.00(monthly |
| Andrea Cobb | Security Guard | $  5,267.00(monthl |
| Gary Kulhan | Security Guard | $  5,267.00(month. |
| Dale Kunkel | "Public Svcs. Admin." | $  6,052.00(monthly |
| Dora Lucas | Security Guard | $  5,267/00(monthly |
| Jason Moody | Security Guard | $  4,756.00(monthly |
| Diane Owens | Security Guard | $  5,164.00(monthly |
| Shon Orill | Security Guard | $  4,756.00(monthly |
| Sandra Hays | Security Guard | $  5,764.00(monthly |
| Rosemary Hays | Security Guard | $  4,336.00(monthly |
| Ryan Kerr | Security Guard | $  4,756.00(monthly |
| John Jeslis | Security Guard | $  5,267.00(monthly |
| Katrina Parker | Security Guard | $  5,267.00(monthly |
| Curtis Parsons | Security Guard | $  5,542.00(monthly |
| Javier Perez | Security Guard | $  5,267.00(monthl. |
| Wanda Pennock | Security Guard | $  4,605.00(monthly |
| Greg Scott | TDF Facility Director | $  5,933.00(monthly |
| Virginia Shelton | Secretary | $  4,844.00(monthly |
| Colette Volk | "Public Svcs. Admin." | $  6,923.00(monthly |
| Jason White | Computer Tech. | $  7,653.00(monthly |
| Michael Wise | Maintenance | $  7,294.00(monthly |
| Jerry Worley | Security Guard | $  5,267.00(monthly |

***The above salaries are a random sample of the approximately 330
TDF staff that are earning similar salaries as indicated above.
(Source: Illinois D.H.S. Office of General Counsel, 2013 data).

18). Plaintiffs further allege that the DHS evaluator defendants (Diane Dobier, Joe Proctor, Kim Weitl, Steve Gaskell, Edward Smith, David Suire, Richard Travis and other John/Jane Doe DHS evaluators) are paid an average of $130,000.00 annually.

19). Plaintiffs allege that administrative staff at the TDF have knowingly and deliberately falsified official state documents in the form of Illinois State Board of Education "Daily and Monthly Attendance Sheets" for academic/vocational classes that have never existed at the Rushville TDF. These classes are reported to the I.S.B.Ed. indicating that TDF residents attend actual classes, that have never been conducted. These falsely reported classes include "Textile Manufacturing"; "Product Marketing"; "Food Service-Culinary Arts"; "Automotive Maintenance"; "Maintenance/Building Maintenance" and, numerous others. On information and belief, false grade reports and progress forms are filled out and submitted to the I.S.B.Ed. and that funding for these phantom classes is recieved by certain of the defendants. How it is used and by whom, is anyone's guess.

20). TDF residents are fed a diet of the lowest grade prison food imagineable; are denied such basic amenities as paper towels; toilet paper is rationed as are trash bags. The in-house commissary (that operates on a token economy system and not "real" money), has been minimally stocked and many other basic services are being eliminated or scaled back, due to lack of funds, while the TDF staff collect disproportionately high, and at times, almost unbelievable salaries from Illinois taxpayers,,,while providing the laziest, toxic, uncaring, overly punitive prison like life for "TDF patients" that can only be understood when experienced. Over 300 TDF "patients" are diabetic. This number is shocking.

21). The relevent Illinois Administrative Code governing the Rushville TDF is, as stated above, 59 Illinois Administrative Code, Part §299.00. (hereinafter, "Title 59").

22). Title 59 requires that TDF residents, who perform work assignments that "have consequential benefit to the Department" are required to be compensated commensurate with prevailing state and federal wage laws.

23). No TDF resident has ever been paid actual money for job performance at the TDF. TDF residents (patients), perform daily tasks essential to the operation of the TDF. The jobs that the patients perform include, but are not limited to; dietary cooks, dietary bakers, dietary cleaners, facility trash, laundry operators, facility movers, facility cleaners, facility hazardous materials cleaners, gymnasium cleaners, administration building cleaners, floor care, and many-many more essential services that have consequential benefit to the Department.

24). On information and belief, the TDF annual operating budget includes or has included financial resources for TDF patients to be compensated, as required by Title 59 and, on further information and belief, those funds have been misappropriated.

25). Plaintiffs and the proposed class members assert that if a truly independent audit of the TDF's financial/fiscal operation; staffing and related issues (over-paid staff who do nothing and collect huge salaries); the educational/rehabilitation departments operation(s), funding and falsification of I.S.B.Ed. daily and monthly attendance sheets, and other related documents and, the over-all operation of the Rushville TDF, will reveal substantial fraud, misappropriation of funds, theft of honest services and many other violations of Federal, State,   and administrative law and regulations.

26). The Plaintiff brings this action seeking review and trial of
"the totality" of the manner in which he is purportedly civilly
detained. Plaintiff, in reality has been re-imprisoned in violation of
his Federal and State Constitutional rights, based upon his prior
criminal convictions for which an entire prison sentence has been
fully served. Plaintiff will prove at trial that the Rushville TDF is
a maximum security prison, that forces rules that are identical to IDOC
prison rules upon the plaintiff. Additionally, the plaintiff will prove
at trial that all defendants, individually and in concert with one
another, have created an illegal, unconstitutional, secondary Illinois
prison system under the label of a "civil" treatment oriented law.
The Plaintiff will prove that his confinement, from top to bottom, is
not rationally nor logically related to the purpose for which he is
purportedly "civilly confined".

27). Plaintiff readvances herein par.'s ¶1 thru ¶25, above.

28). Plaintiff will further prove at trial that the Illinois Attorney
General's Office, specifically the "SVP Bureau", administered by
Defendants MARASCO, SMILEY-BLOMGREN and various JOHN/JANE DOE prosecutors,
have knowingly, deliberately and repeatedly committed civil rights and
constitutional rights violations by "re-prosecuting" the plaintiff, and
every other of the 560-plus TDF civil detainee's for previous crimes
in order to obtain civil commitment under the SVPCA. While "hiding in
plain sight", citing a "civil" justification, these defendants have
deliberately violated the plaintiff's rights against Ex Post Facto
and Double Jeapordy violations. In so doing, Defendant LISA MADIGAN,
Joelle MARASCO, Debra SMILEY-BLOMGREN (and their JOHN/JANE DOE assistants),
have maliciously, deliberately and illegally prosecuted and caused the

26

indefinite civil imprisonment of individuals whose only qualifier under the SVPCA was a conviction for one of the enumerated crimes set forth in the SVPCA. Madigan, Marasco, Smiley-Blomgren and their subordinate (John/Jane Doe) SVP Bureau prosecutors, have knowingly, deliberately and maliciously violated U.S. Supreme Court directive prohibiting SVPCA commitment based on past conduct. (Samuelson). In many cases, decades old criminal offenses are used as the sole basis for these prosecutions, as is the plaintiffs' case.

29). Plaintiffs rights have been violated where the foregoing SVP-Bureau prosecutors, in conjunction with the "DHS Evaluator" defendants and Defendant Bednarz, have created a parallel prison system and are violating the Federal  Constitutions prohibition against double jeapordy by re-prosecuting and re-imprisoning the plaintiffs, a second time, for crimes that have already been adjudicated and for which full prison terms have been served.

30). The Liberty, DHS/TDF and other defendants have imposed, inflicted and unjustly subjected plaintiffs to conditions of confinement including placement in a prison; treatment like prison inmates and, substandard, prison services, in violation of the civilian plaintiffs Constitutional rights, as afforded the Plaintiff by the Due Process Clause of the U.S. Constitution.

31). That Liberty; DHS-Evaluator defendants; defendants Scott, Dimas, Freeman, Clayton, Bierman, Caraway, Wexford and various other John/Jane Doe Defendants have created a punitive, prison-like enviornment that violates plaintiffs clearly established rights to be free from unjustified bodily restraint, inhumane treatment; free speech and association, unreasonable search and seizure, privacy by inflicting unjustified, illegal prison confinement upon Plaintiff (and other TDF "civil" detainees) who is a United States citizen with all constitutional rights and protections under law.

27

32). Defendants Scott, Clayton, Liberty, Jumper, Caraway,
Hankins, Bierman, Dimas, Freeman and Bednarz have created a
punitive prison disciplinary rule and adjucation policy, or,
have participated or, ignored complaints about the prison
disciplinary policies in-place at the TDF that violate the
plaintiffs right to be free from bodily restraint; to be free
from punitive sanctions including search and seizure of the
plaintiffs privately owned personal effects and; plaintiffs
rights not to be placed in a prison segregation unit or solitary
confinement cell, or, forced to wear handcuffs behind their backs
or be forced to wear yellow prison jumpsuits as punishment for
purported TDF rule violations.

33). Defendant Hankins, regularly has forced TDF patients,
including the plaintiff,to "double-cell" with other TDF patients,
by force and against their will and, if the patient refuses, per
the policy of Defendants Hankins, Scott, Clayton, Biermann,
Jumper, Caraway, Liberty and various other defendants, a tactical
assault team assaults the patient, handcuffs and shackles him and
them forces him to be humiliated and embarresst by removing plaintiff
from the living unit, be paraded through the entire facility in
custody of the tactical squad and, forced into a solitary confinement
prison cell in the TDF's segregation unit.

34). By imposing the foregoing conditions of confinement upon
the civilian plaintiff , these defendants are violating the plaintiffs
right to be free from bodily restraint, false arrest, false
imprisonment, denial of due process and, violation of the FEDERAL
Constitutions guarantee of Equal Protection under the law where no
other DHS mental health patients are subjected to such practices,
policies, bodily restraint, false arrest, solitary confinement or
constant fear of violence at the hand of staff.

28

35). All of the issues, facts, conditions of confinement

claims, staff abuses, financal malfeasance, prosecutorial

misconduct, official misconduct and significant statutory,

common law and constitutional claims, are not new or novel.

Numerous complaints have been sent to Defendants Michael Madigan,

John Sullivan, James Dimas, Anderson Freeman, Greg Scott, Lisa Madigan,

Charles Clayton, Joseph Hankins, Dave Bierman, Liberty, Shan

Jumper, Sharlene Caraway and other defendants. These complaints

took on many forms including letters, formal grievances, lawsuits,

civil rights actions, attorney communications, e-mails, grievance

appeals and other forms and, there have been no corrective actions

taken whatsoever. Most recently, Defendant COLEMAN has turned a blind eye.

36). Plaintiff, asserts and re-asserts fear of retalliation,

reprisals or other negative consequences being taken against

him for bringing this action. Numerous complaints have been

tendered to various regulatory agencies and courts that center

on retalliation being taken against TDF patients who have filed

complaints or brought litigation against the state officials

responsible for implementing/operating the SVPCA.

37). Plaintiff· can prove at trial,,, that numerous TDF staff

have claimed, stated and emphasized that Defendant Sullivan is a

life-long resident of the Rushville area and, when he became a

state senator, he used his influence with Defendant Michael Madigan,

Speaker of the Illinois House of Representatives, to bring the

TDF program to Rushville (from its previous location in Joliet)

and, that "Sullivan and Madigan have the Courts sewn up in Central,

Illinois" and, "if you know what's good for you, you won't sue us

or you'll never get out of here, Sullivan and Madigan will make

sure of that". The Plaintiff asserts that retalliation is the

"norm" at the TDF and that he will suffer consequences as a very

38). Plaintiff further asserts that during the last election cycle where former Governor Quinn was challened by current Governor, the Honorable Bruce Rauner, that TDF staff threatened members of the plaintiff class with retalliation for "voting for Rauner". (note: as a "civilian", the plaintiff is legally allowed the right to vote at the TDF).

39). That retalliation is "the norm" and not the exception for TDF patients who bring litigation or otherwise file complaints against TDF staff or administrators. (This Court is aware of these facts)

40). Plaintiff asserts that well over ONE HUNDRED seperate complaints have been filed, against TDF staff with the Executive Inspector General for the Agencies of the Illinois Governor concerning issues such as staff abuse; the filing of false disciplinary charges; violations of due process; imposition of punitive conditions of confinement that violate section §207/40(b)(2) of the SVPCA, **and many other serious issues**. Some of these complaints were filed by TDF patient's family members and lawyers. The majority were filed by TDF patients.

\*\*\*NOT A SINGLE COMPLAINT HAS EVER BEEN ACTED UPON BY THE Executive Inspector General related to a TDF patient complaint, and;

a). Over TWO HUNDRED complaints were filed by TDF patients with the Illinois Dept. of Financial & Professional Regulation for issues concerning violations of the Clinical Psychologists' Licensing Act; psychologists falsification of official clinical records; ethics violations; infliction of brutality and covering it up and many other serious issues. \*\*\*NOT A SINGLE COMPLAINT HAS BEEN ACTED UPON BY THE Illinois Dept. of Financial & Professional Regulation related to a TDF patient complaint (or complaints filed on their behalf with IDFPR).

41). The plaintiff asserts in good faith that when viewed in its totality, the TDF is operated exactly like, and in some cases, more punitive than penal institutions. The Defendants have abandoned the concept, and at this point, even the "illusion" that the plaintiff is "a civilian who cannot be punished".

## JURISDICTION AND VENUE

42). This Court has jurisdiction over this civil rights action pursuant to 42 U.S.C. §1983 as well as Supplemental jurisdiction over matters of state law by exercising its pendent jurisdiction as allowed by 28 U.S.C. §1331. Venue is properly conferred upon this Court pursuant to 28 U.S.C. §1391 where events and incidents leading up to this lawsuit took place in Schuyler County, Illinois.

## THE PARTIES

43). The Plaintiff has at all times relevent to this lawsuit, been a civilian "patient" at the Illinois Dept. of Human Services, "Treatment & Detention Facility" (the TDF) located at 17019 County Farm rd. Rushville, Illinois 62681. He is a citizen of the United States of America and the State of Illinois. As such he is guaranteed all of the rights, protections and immunities as afforded him by the United States Constitution and the laws and treatises of the United States of America, the State of Illinois and the common law. It must be stated that at no time during the events giving rise to this Complaint, was the Plaintiff serving a sentence for any criminal offense. His custody was, has been and is entirely "civil" in nature. Nevertheless, the Defendants are imposing illegal and unconstitutional punishment upon him without Due Process of Law.

44). Defendant MICHAEL MADIGAN is the Speaker of the Illinois House of Representatives located in Springfield, Illinois. His

political influence in the State of Illinois cannot be over-stated and, on information and belief, he was instrumental in the enactment of the SVPCA and, its transfer to the Rushville TDF. He is sued in his official and individual capacities.

45). Defendant Lisa Madigan is the Illinois Attorney General. As such, she has both prosecuted every case under the SVPCA (through her subordinate "SVP-Bureau") and, has defended TDF employees in dozens of cases where numerous TDF civilian patient/detaiees' have brought legal actions against TDF employees for misconduct as well as conditions of confinement. She is sued in her official and individual capacities.

46). Defendant John Sullivan was the State Senator for the West Central section of Illinois including Schuyler County which is where the Rushville TDF is located. On information and belief, he was instrumental in bringing the SVPCA program to Rushville, (in conjunction with Defendants Michael and Lisa Madigan) and for "taking whatever steps necessary" to ensure the continued viability of the TDF facility. He is sued in his official and individual capacities.

47). Defendant James Dimas, is the current "Secretary of the Illinois Dept. of Human Services". As such, he is responsible for implementing sections of the SVPCA for the care, custody and control of persons subject to the Act. He is sued in his official and individual capacities.

48). Defendant Joelle Marasco is an Assistant  Attorney General and, is appointed by Defendant Lisa Madigan to serve as the "SVP-Bureau Chief". As such, at all times relevent to this Complaint, she has created, devised, refined, influenced and implemented the templated method under which the Plaintiff was prosecuted under the SVPCA, in-effect, "re-trying" him for his prior criminal charge.

32

and, is directly responsible for the unlawful, unconstitutional and unjustified prison-like confinement of over 550 Illinois citizens. She directly supervises and manages each SVPCA prosecution in the State of Illinois. She has also created a policy where she wields unethical influence over psychologists working for the State of Illinois in SVPCA cases. She is sued in her official and individual capacities.

49). Defendant Debra Smiley-Blomgren is "The Assistant SVP Bureau Chief" in the Illinois Attorney General's Office, and, while working with Defendant Marasco, has played a significant role in creating, devising, refining, influencing and implementing the templated method in which Illinois citizens are prosecuted under the SVPCA where over 550 Illinois citizens are being unlawfully and unconstitutionally confined under the Act. She has also created a policy where she wields unethical influence over psychologists working for the State of Illinois in SVPCA cases. She is sued in her official and individual capacities.

50). Defendants ANDERSON FREEMAN and SHARON COLEMAN have at times relevent to this Complaint, been in the position of IDHS Bureau Chief over the IDHS facilities where the SVPCA has been implemented. As such, they have been the IDHS Administrator having supervisory authority over the TDF Facility Director. They havebeen directly involved with the implementation of policies, conditions of confinement, grievance appeals from TDF patients and, is specifically responsible for creating a parallel prison system in Illinois in direct violation of the constitutional, statutory and common law deprivations inflicted upon over 550 Illinois citizens held under the SVPCA. They are sued in in their individual and official capacities.

51). Defendant Michael Bednarz was employed as the "Medical Director" at the TDF. He is also directly involved in the hiring, training, methods and templated manner in which clinical psychologists employed by IDHS (under contract) create, manufacture and unethically conduct psychological evaluations of persons subjected to the SVPCA. He also, on information and belief, has worked with various other state officials, including the Illinois Attorney General's Office, to create, draft and implement rules and regulations related to the SVPCA. He is also directly responsible for the creation of a secondary, parallel prison system thereby violating the constitutional, statutory and common law rights of over 550 Illinois citizens who are imprisoned under the false justification of a medical basis or diagnosis under the SVPCA. He is sued in his official capacity as well as under Administrative laws, ethical standards and in his individual capacity.

52). Defendant Greg Scott is employed as the TDF Facility/Program Director. As such, he is directly responsible for the daily care, control and operation of the Rushville TDF. He works directly under FREEMAN and COLEMAN in formulating, implementing, creating and enforcing rules and regulations under the laws and statutes of the State of Illinois. He is responsible for imposing prison-like conditions of confinement on Illinois citizens under the SVPCA. He is sued in his official and individual capacities.

53). Defendant Charles (Christopher) Clayton is currently enployed as the TDF Security Director. He was recently promoted to this position after being employed as the TDF "Internal Investigator" for a number of years. He is responsible for imposing prison-like conditions of confinement on Illinois citizens under the SVPCA. Working with Defendant Scott, he has violated the rights of numerous persons held at the TDF including the Plaintiff. He is sued in his official and individual capacities.

34

54). At times relevent to this Complaint, Defendant JOSEPH HANKINS
was employed at the TDF as a "Public Services Administrator". He wore
a police-styled uniform and displayed "Majors Leafs" on his collar.
He wieled unbridled authority over the plaintiff as a member of
the TDF Behavior Committee, the TDF "Rooming Committee" and the TDF
"Executive Committee". He retired in June 2017 and his position has
been filled by Defendant WANDA PENNOCK. Both HANKINS and PENNOCK have
systematically, deliberately and consistently violated the civil and
constitutional rights of the plaintiff and hundreds of other TDF
patients by, among other things; denying due process at disciplinary
hearings; covering up staff misconduct including, line-level security
staff provoking TDF residents into maladaptive behaviors; staff on
patient physical and verbal assaults and batteries; by follwing the
direction(s) and agendas of Defendants SCOTT and CLAYTON by imposing
unlawful, non-therapeutic punishments upon TDF patients and; by on
numerous occasions, forcing plaintiff and other TDF patients to
cohabitate in small prison cells, designed for single juvenile
occupancy knowing such directives to endanger the mental and
physical safety of the plaintiff. Additionally, as Rooming Committee
decision makers, both HANKINS and PENNOCK deliberately ignore the
fact that dozens, if not hundfreds of TDF patients have fallen out
of the "makeshift" top bunks, installed by TDF maintenance staff
that have no safe way to get up or down. They have placed plaintiff
into forced double celling with "patients" that the State of Illinois
claims and alleges are "too dangerous to be released because of a
mental disorder he cannot control". Both HANKINS and PENNOCK have
issued these orders, knowing that if a TDF patient refuses, he will
be confronted by violent, aggressive guards; will be handcuffed and
locked up in segregation; written up and then punished for "interfering
with facility operations" by the Behavior Committee that Hankins

35

and, now PENNOCK chair. Defendants HANKINS and PENNOCK are both sued individually and personally.

55). Defendant DAVID BIERMAN has at all times relevent to this Complaint, been employed at the TDF as an "STA-IV". He has been designated by Defendant SCOTT as a "Shift Commander" and until recently, was the long-term "day shift" supervisor of the TDF security force, following and implementing the itinerary, agenda, policies, directives and orders of Defendants SCOTT, CLAYTON and HANKINS. He has been vested with significant decision-making authority by Defendants SCOTT, CLAYTON and HANKINS and would routinely make day to day decisions regarding the placement of TDF "patients" in segregation; the citing of "patients" with rule violations; the supervisory review and approval of line-level or "STA-II's" assignments, report writing and referrals to the Behavior Committee of "patients" who had been "written up" by STA's for alleged rule violations. Defendant BIERMAN is in part responsible for imposing, implementing and creating the punitive, toxic, prison-like enviornment that was directed by and approved of by Defendants SCOTT, CLAYTON and HANKINS. He would make day to day decisions over "patient's" rights and conditions of confinement, including approval/denial of property rights; the denial of requested emergency bathroom stops during transports out of the TDF and numerous other day to day decisions. BIERMAN does not possess the education, licensure or training to make decisions based on "professional judgment". He is sued individually and in his official capacities.

56). Defendant LIBERTY HEALTH, Inc., is a Pennsylvania Corporation that holds the contract at the TDF to provide various positions including Therapists, Grievance staff and other staff. On information and belief, the plaintiff states and claims that

36

Liberty was implicated in the Federal Indictment of former Illinois
Dept. of Corrections Director, Donald Snyder, where, on information
and belief Liberty was awarded "millions of dollars in contracts
to provide health care services at Illinois prisons". (USDC-N.D.-Ill.
Case 07-CR-457). Liberty and its staff at the TDF are directly
involved in the creation, implementation of, policies, practices
and imposition of prison-like conditions of confinement on over 550
Illinois citizens. Liberty purports to "treat" persons held under
the SVPCA, utilizing methods that are speculative, conjecturous, and
-- are in reality, pre-textual to cover-up the re-imprisonment of
TDF patients. The president of Liberty is Herbert Caskey. The
plaintiff assert that per an Illinois Dept. of Financial/Professional Reg.,
Freedom of Information response dated August 6, 2014, signed by
.....Deputy General Counsel, Mark Thompson, "IDFPR has not issued
any license to any corporation called Liberty Health Care, or Liberty
Health, or Liberty, or any similar designation, to practice psychology
or social work in the State of Illinois.".

Liberty is reaping millions of dollars of Illinois taxpayers money,
and is essentially being paid to operate unlicensed and to violate
the constitutional, civil, statutory and common law rights of over
550 Illinois citizens held against their will at the TDF. Liberty
and Caskey are sued both, in their official and individual capacities.

57). Defendant Shan Jumper is a Liberty employee and has at all
times relevent to this complaint, worked at the TDF as "Clinical
Director". He is the senior Liberty/clinical staff member at the TDF.
He has been directly responsible for implementing, promulgating,
devising, enforcing and otherwise administering the SVPCA at the
TDF. He is sued in his official and individual capacities.

58). Defendant Sharlene Caraway has at all times relevent to
this complaint, been a Liberty employee, working at the TDF as
the "Associate Clinical Director". As such, working with the other
named defendants and under the direct control of Jumper, has been
responsible for implementing the SVPCA at the TDF. She is sued in
her official and individual capacities. (see Carraway Grievance Response  04-15-
AR-0423-attached)

59). Defendant Wexford Healthcare Corporation is a private health
care corporation that is nationwide in its activities obtaining jail
and prison contracts to provide health services to inmates. In Illinois,
Wexford is based out of the State of Illinois Center in Chicago where,
working in conjunction with the Illinois Attorney General's Office,
SVP-Bureau, clinical psychologists make initial evaluation recommendations
for the civil confinement of SVPCA respondents. Wexford also has the
healthcare contract at the Rushville TDF. The Wexford John/Jane Doe
defendants to be named upon discovery of their identities, have
formulated, implemented and enforced health-care policies at the
TDF. Wexford and its owners are sued in their official and individual
capacities.

60). Defendants Kimberly Weitl, David Suire, Richard Travis,
Steven Gaskell, are under DHS contract, and, along with various other
John/Jane Doe defendants are all IDHS employed clinical psychologists
who, working under the auspices, guidance, control and direction of
Defendants Bednarz, Dimas, Freeman, Lisa Madigan, Joelle Marasco,
Debra Smiley-Blomgren, and subordinate Assistant Attorney Generals
in the SVP-Bureau, conduct pre and post-trial evaluations of TDF
patients under the SVPCA. As will be developed below, these defendants
have over the course of an extended period of time, knowingly and
deliberately committed constitutional, civil, statutory and common
law rights violations, individually and in conjunction with other
defendants named above. They are sued in their official and individual

38

capacities.

61). Defendant ARAMARK CORRECTIONAL FOOD SERVICES, Inc., and
its TDF on-site manager, Defendant STEVE DREDGE, are the private,
for profit, food service provider contracted to provide healthy
and safe foods to the plaintiff and others civilly detained at
the TDF. This private prison food company, has with the direct
and express approval of Defendant SCOTT, sacrificed the health
of the plaintiff and over 560 other TDF patients by providing
substandard food items that are frequently devoid of nutrient
content, are putrid, non-appetizing and that TDF staff often
refuse to consider consuming. Defendants DREDGE and ARAMARK are
sued under all theories applicable pursuant to 42 U,.S.C. §1983 cases.

62). The various JOHN/JANE DOE Defendants, to be named upon
discovery of their identities are individuals, as will be described
below, who have participated in, directed or approved of policies
that have violated the Plaintiff's civil and constitutional rights.

## COUNT I

FOR.HIS FIRST CAUSE OF ACTION against Defendants LISA MADIGAN,
JOELLE MARASCO, DEBRA SMILEY-BLOMGREN, various other Illinois Assistant
Attorneys General now named as JOHN/JANE DOE defendants, the plaintiff
hereby re-advances and incorporates herein, par.'s ¶1 thru ¶62 above,
as if fully set forth herein and alleges each applicable claim in
this COUNT. Plaintiff further states that;

63). Each paragraph under the Count applies to each named
defendant named under Count I above.

64). The defendants are illegally, unlawfully and deliberately
violating the Plaintiffs civil rights by causing his imprisonment to
be extended past his lawful release date under the false, purported
justification of "civil confinement for treatment purposes". They
are knowingly and intentionally mis-useing the power of their office(s).

65). Defendants are violating Plaintiffs' constitutional rights under the Federal constitution, through their involvement in, whether directly or by directing subordinates to act where the specific manner in which civil commitments are obtained under the SVPCA, by the Illinois Attorney Generals' Office, Lisa Madigan, Joelle Marasco, Debra Smiley-Blomgren, and their subordinate assistants, are by design, not reasonably related or narrowly tailored for the purpose of commitment under the Act but is, in reality, tailored to cause the extension of incarceration of Illinois citizens after they have fully completed prison sentences.

66). Non-criminal confinement must have a non-criminal purpose. The SVPCA itself has specific elements that must be proven to obtain initial commitment and thereafter, the same elements must be re-proven to continue that commitment beyond one year.

67). In Illinois, a person must suffer from a serious mental disorder that causes volitional impairment so severe that he or she, "as a result of the mental disorder is substantially probable to engage in future acts of sexual violence" if not confined for treatment.

68). In Illinois, a person held under the SVPCA "cannot be involuntarily committed based on past conduct" as per the clear directive of the Illinois Supreme Court in its In re Det. of Samuelson decision.

69). In Illinois, a person must be released from civil custody when he is no longer a danger to others.

70). In Illinois, Defendants Lisa Madigan, Joelle Marasco, Debra Smiley-Blomgren, and their John/Jane Doe assistants, have regularly and routinely caused persons to be civilly imprisoned under the SVPCA, in direct violation of the Federal Constitution

jeapordy prohibitions by;

- a). Causing persons to be civilly imprisoned based upon nothing more than the fact that they were convicted of qualifying criminal offenses, in some cases, 20-30 years earlier, and;

- b). Causing persons to be civilly imprisoned in the complete absence of any symptoms of mental illness or disorder, and based exclusively on past conduct, and;

- c). Causing persons to be civilly imprisoned based upon mental health disorders, purportedly taken from the DSM-IV-TR and/or the DSM-5, that the very authors, researchers, scientists and medical doctors from the DSMs' have stated unequivocally, do not exist, or, are "wastebasket disorders with no foundation in DSM", and;

- d). By wielding and useing unethical, illegal tampering and manipulation of IDOC and IDHS clinical psychologists (and one M.D.) who conduct purported forensic evaluations under the SVPCA, to ensure a pro-prosecution outcome, and;

- e). By misleading courts and juries in SVPCA cases to find in favor of the prosecution by advancing that the "3rd-element" (required by §207/5(f)) is proven by use of actuarial risk assessments. The 3rd element requirement is "as a result of the mental disorder, it is substantially probable the person will engage in future acts of sexual violence." The actuarial risk assessments neither detect the presence or, nor measure the severity of any mental disorder, and;

- f). By causing persons who have already undergone extensive sex offender treatment while in IDOC to be civilly committed under the SVPCA, further proving punitive intent, and;

- g). By causing persons already committed under the SVPCA, to remain committed based on the same, antiquated evidence used to obtain initial commitment and not relevent to the persons' current mental state, and;

- h). By re-use of actuarial risk assessments that are "static", unchangeable, purely historic tools that cannot measure or detect a persons current mental state, and;

- i). By causing persons who have not exhibited any symptoms or dangerous behaviors, actions or thought processes to remain civilly committed under the SVPCA, some for many, many years, and;

41

j). By knowingly and deliberately illiciting prosecutions
under the SVPCA of persons who have served long periods
of time in state custody and, who have reached the stage
of life where they have "aged out" of dangerousness yet,
are still prosecuted and re-prosecuted, even when serious
and debilitating medical conditions further decrease the
likelihood of future criminality, well below the SVPCA's
"substantial probability" standard, and;

k). By knowingly prosecuting persons under the SVPCA whose
underlying criminal offenses took place prior to final
brain maturity being obtained and then, causing loss
of liberty under the SVPCA based on diagnosis of an
alleged <u>adult</u> mental disorder, based on conduct from
an earlier stage in life where the "self" had yet to
fully form, and;

l). By falsely asserting to courts and juries that the reason
for the Attorney General's prosecution of persons under
the SVPCA is to "provide treatment" to the individual
when in reality, the <u>only motive</u> that Lisa Madigan,
Joelle Marasco, Debra Smiley-Blomgren and their SVP-
bureau's assistants <u>actually</u> operate under is to extend
the incarceration of persons, after having completed full
(and in some cases, very long) prison terms. These acts,
in direct violation of the  Federal Constitutions prohibitions
against ex post facto and double jeapordy laws, and;

m). By knowingly and deliberately participating in, furthering,
creating, conspiring with other defendants, to create an
illegal, unconstitutional, secondary Illinois prison
system in violation of the Due Processes Clause and
Ex Post Facto/Double Jeapordy laws, and;

n). By causing persons to remain confined in the TDF, based
upon new or changed diagnostic conclusions that have never
been proven at a trial before a properly empaneled trier
of fact, violating the due process, confrontation and
right to trial requirements of the Due Process Clause;

o). By seeking and obtaining commitments by nullifying juries
with repeated trial arguments centering on the facts of
historic criminal convictions and not on a mental health
basis, and;

p). By deliberately misleading Illinois circuit court,
Appellate Court and Supreme Court judges and justices
into believing that statutory requirements under the
SVPCA have been met regarding diagnosed mental disorders,
where the act defines qualifying mental disorder as
"congenital or acquired" conditions. In fact, the DSM-IV-TR

42

-and DSM-5 do not identify a single paraphilic or
personality disorder as having a "congenital or an
acquired" origin and;. by soliciting unqualified
testimony about these medical conditions, from the DHS
Evaluator defendants who, with the exception of
                are not medical doctors and accordingly,
are not properly licensed nor educated to diagnose
medical conditions, and;

q). By violating the SVPCA statute as well as the Sex Offender
Management Board's requirements for conducting an evaluation
under this Act, found at 20 Ill.Admin.Code §1905.240 where,
for example, "medical testing necessary for diagnosis" is
required and, the non-medical doctor DHS Evaluator (defendants
have never complied with this, or other mandatory sections
of §1904.240 and, nevertheless, defendants prosecute
Illinois citizens and cause long-term civil imprisonment
in absence of proper medical standards being followed and;

r). By failing to take any intervening or corrective actions
as the "public lawyer for all Illinois citizens" where over
the long-term, Madigan, Marasco and, her SVP-Bureau
assistants in the Attorney General's Office are well aware
that more men have been discharged by death than by way
of the sham and pretextual "treatment" program that they
misrepresent to Illinois' jurors justify sending SVPCA
respondents into, and;

s). Where these defendants have admitted in court pleadings
(filed in Cook County Criminal Court), that "the issues
in the criminal case and in the SVP case are identical,
e.g., whether the defendant committed rape", there can be
no debate that these defendants are knowingly, deliberately
and intentionally violating the Federal  constitution.

71). The foregoing acts, policies, templates, prosecution methods,
omissions and conduct are knowing, deliberate acts that violate the
Federal  constitution. Defendants are operating on deliberate bad
faith and have been doing so since the inception of the SVPCA.

72). The extreme pain and suffering Defendants Lisa Madigan,
Joelle Marasco, Debra Smiley-Blomgren and their subordinate SVP-
Bureau prosecutors have caused are the result of deliberate, bad
faith, deliberate breaches of Federal and State law,, and the well
established applicable law as decided by the United States Supreme
Court in Kansas v. Hendricks, Kansas v. Crane, Foucha v. La.,
Addington v. Texas, Vitek v. Jones (cites omitted), and their
progenies.

43

73). Defendant Lisa Madigan has disseminated false and mis-
leading information to the citizens of Illinois to justify her
politically motivated agenda in justifying the over-zealous
prosecution of persons under the SVPCA. She has misinformed the
public that "persons convicted of sex crimes have a 98% recidivism
rate" when in fact, the United States Dept. of Justice conducted an
extensive study, including 15-states and the recidivism rates of
persons convicted of sexual crimes. The reported actual recidivism
rate is 3.5%. (USDOJ #198281 INCLUDED ILLINOIS IN ITS RECIDIVISM STUDY)(emphasis)

74). Continuing to prosecute persons under the SVPCA has
cost the Illinois taxpayers untold millions of dollars in court
costs, attorneys fee's, expert witness fee's, transportation
costs, court costs, Appellate Court costs, Illinois Supreme
Court costs and other related expenditures related to the SVPCA.

75). Defendants Lisa Madigan, Joelle Marasco, Debra Smiley-
Blomgren and their John/Jane Doe SVP-Bureau assistants, have violated
Due Process, constitutional, civil, statutory and common law rights
of over 550 Illinois citizens and, have violated the public trust.

76). The agenda of Defendants Madigan, Marasco and Smiley-
Blomgren are outside the lawful practice of law, are deliberate,
willful and on information and belief, are personal in nature.
Their actions, as set forth hereinabove, are not shielded by
prosecutorial immunities where they have deliberately caused
the unlawful imprisonment of over 550 Illinois citizens on the
basis of false, perjured or otherwise inaccurate evidence that
they have presented, again and again to various Illinois courts
and juries. ALL of the foregoing, has violated plaintiff's rights.

77). Unless relief is granted, Plaintiff will continue to be
injured by and as a direct and proximate result of these Defendants
acts and omissions specifically set forth above.

44

COUNT TWO

78). Plaintiffs incorporate and re-advance all specific and general allegations, as set forth above, as if fully set forth herein.

79). Defendant Michael Madigan is the Speaker of the Illinois House of Representatives and is Defendant Lisa Madigan's father. Defendant Michael Madigan's political influence and power is widely known and has been reported on in numerous main-stream news media reports. Persons in political office in Illinois, whether legislative or judicial, are well aware that Defendant Madigan has the ability to virtually end a political career should an Illinois state employee fall into the disfavor of him.

80). On information and belief, Defendant Michael Madigan has wielded his political influence to support his daughter, Lisa Madigan's political career and agendas, including the SVPCA.

81). On information and belief, and as has been repeatedly stated by TDF security staff on various occasions, "as long as Michael Madigan is in office, you guys (TDF patients) will never get anywhere in court". (at trial, plaintiff will produce supporting testimony from TDF staff) Plaintiff  state that with very limited exception, valid legal claims raised in courts throughout Illinois, have fallen on deaf judicial ears because as stated above, no state official in Illinois would even consider ruling in any way against the Madigan's agenda. Michael Madigan's level of corruption is widely known.

82). On information and belief, Defendant John Sullivan, a life-long resident of the City of Rushville and also, the former State Senator for the Rushville area, is a close political ally and friend of Defendant Michael Madigan. Plaintiff will prove at trial that numerous TDF STA's have repeatedly claimed that "John Sullivan controls the courts in Central Illinois, that why you guys will never get anywhere bringing lawsuits against us."

83). On information and belief, Defendants Michael Madigan
and John Sullivan arranged for the Illinois Dept. of Human Services
to take possesion of the Illinois Dept. of Corrections maximum
security prison at Rushville for purposes of confining Illinois
citizens under the SVPCA at the facility. Indeed, DHS took control
over the facility and renamed it "The Treatment & Detention Facility".

84). As a direct and proximate result of the actions of Defendants
Michael Madigan and John Sullivan, Illinois citizens who are being
held under a completely "civil" process for purposes of treatment
and not punishment, were and are confined at the Rushville TDF
because of, in part, the actions of Madigan and Sullivan.

85). Plaintiffs assert that numerous letters and grievances
have been submitted to Defendants Michael Madigan and John Sullivan,
detailing the extremely punitive, prison-like conditions at the TDF
and that Madigan and Sullivan have turned a deliberate blind eye
to what is happening at the TDF.

86). Defendants Michael Madigan and John Sullivan have taken
steps to further, support, promote, fund and staff the TDF while
costing the taxpayers of Illinois HUNDREDS OF MILLIONS OF DOLLARS
and while violating the Federal  constitutional, civil, statutory
and common law rights of over 550 Illinois citizens who are confined
against their will by DHS at the TDF.

87). These defendants have violated the public trust and by
furthering, promoting, assisting and otherwise ensuring the
continued expansion of the TDF, have entered into the deliberate
and willful unlawful, false imprisonment of over 550 Illinois
citizens. Plaintiff alleges and claims that Defendants MADIGAN and
SULLIVAN have wielded their political power and influence to ensure
the ongoing violation of the Plaintiffs' civil and constitutional rights.

46

88). Unless relief is granted, Plaintiffs will continue to be injured by and as a direct and proximate result of Defendants acts and omissions specifically set forth above.

## COUNT THREE

89). Plaintiff incorporates, and re-advance all specific and general allegations as set forth above, as if fully set forth herein.

90). Defendants DIMAS, FREEMAN, BEDNARZ, COLEMAN, SCOTT, CLAYTON, JUMPER, CARAWAY, BIERMANN, LIBERTY, HANKINS, have all played deliberate parts in creating, furthering, implementing and enforcing policies and procedures that cause, further or otherwise relate to the creation of a secondary, parallel prison system at the TDF that imposes illegal, unconstitutional deprivations of constitutional, civil, statutory and common law rights including, but not limited to, the right to be free from unlawful punitive confinement/imprisonment; the right to be free from bodily restraint; the right to due process of law, the right not to be exposed to double jeopordy and ex post facto violations and, various other rights, immunities and protections as secured by the Constitution of the United States.

91). Defendant Bednarz, earning in excess of $14,000 monthly, has knowingly created, furthered, promulgated and otherwise implemented the manner in which DHS evaluators (and on information and belief, the evaluators from Defendant WEXFORD) conduct purported mental health evaluations of Illinois citizens subject to the SVPCA.

92). Defendant Bednarz has knowingly instructed, directed or otherwise caused the DHS Defendant Evaluators to conduct mental health evaluations that cause persons to be initially committed or for commitment to be continued on an annual basis, on a templated, mechanistic method that is by design, illegal and unethical where;

a). Psychologists who are not medical doctors, render mental health diagnosis under the SVPCA that are beyond the limitations of their licensure and education by alleging that Plaintiffs suffer from "a congenital or acquired" mental disorder, and;

b). Psychologists assert that their use of actuarial risk assessments establish that the diagnosed mental disorder makes it substantially probable that the person will engage in future acts of sexual violence while knowing that these actuarial risk assessments neither detect the presence of a mental disorder or the severity of a mental disorder, and;

c). Psychologists make predictions about future human behavior that is far beyond the limits of their ability, scope of their education or the state of science and are trained (by Bednarz) in the manner in which these "risk predictions" are made. In addition, the terms "risk" and "recidivism" are found no-where in the language of the SVPCA statute, and;

d). Psychologists, under the direction and training of Bednarz, performing SVPCA evaluations diagnose current mental disorders based on antiquated criminal conduct, at times, decades old at the time of the SVPCA evaluation and, then, proffer testimony in Illinois courts causing both the initial and continued civil incarceration of over 550 Illinois citizens, and;

e). Psychologists, under the direction, training and supervision of Bednarz, diagnose DSM mental disorders under the SVPCA that the authors, creators and editors of DSM have stated unquivocally, do not exist and have no support from DSM, causing the civil incarceration of the plaintiff and hundreds of other U.S. citizens involuntarily held at the TDF, and;

f). Combining all of the foregoing, Bednarz directs, trains, supervises, the DHS defendant evaluators who follow a scripted, templated methodology that causes the unjustified civil imprisonment of Illinois citizens held under the SVPCA.

93). Defendant Bednarz' conduct, as outlined in summary above, is known to and by Defendants Dimas, Freeman, Liberty, Scott, Jumper, Caraway and various John/Jane Doe Defendants and, to all DHS Defendant Evaluators. The DHS current "Deputy Director of Forensics", Defendant COLEMAN, is furthering, advancing and approving the foregoing, to this very date.

94). Defendants Bednarz, Dimas, Freeman, Liberty, Scott, Clayton, Hankins, Jumper, Caraway, Biermann, COLEMAN and various other John/Jane Doe defendants have created an illegal, unconstitutional, punitive, toxic prison-like enviornment that unlawfully and un-justly imprisons over 550 Illinois citizens who have not been convicted of a crime nor sentenced to prison by a criminal court to justify the punishment being imposed upon them.

95). The defendants listed above in ¶94 (hereinafter, "Defendants" for purposes of brevity in Count-3), have created a toxic, non-therapeutic, prison enviornment that is not logically nor reasonably related to the purpose for which plaintiff is confined at the TDF.

96). The defendants have knowingly and deliberately imposed conditions of confinement that violate the "least restrictive" requirement of the SVPCA (725 ILCS §207/40(b)(2)) and consequently, are illegal and violate the laws and statutes of the State of Illinois.

97). Defendants have created an extremely toxic enviornment where TDF patients are frequently disrespected by staff and, have been subjected to violence at the hands of security staff with no method or manner to redress complaints or grievances about staff misconduct. In fact, on March 23, 2016, United States Court of Appeals for the 7th Circuit, Judge Posner, discussed the Rushville TDF's failure to follow its own rules under Title 59 and the grievance process. (see Hughes v. Scott, et al, No. 15-3482, USCA (7th), 3/23/16), citing Youngberg v. Romeo, 457 U.S. 307, 321-22 "persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish". (emphasis added). Defendants believe and act as if they are above the rule of law and have created a non-treatment environment that is unconstitutional

and non-compliant with the "least restrictive" requirements of
the SVPCA (725 ILCS §207/40(b)(2)) and, not reasonably nor logically
related to the purpose for which plaintiff is   confined.

98). Defendants subject plaintiff  to confinement in prison
cells designed to house a single juvenile criminal offender and,
specifically, Defendants Dimas, Freeman, Scott, Bednarz, Clayton, PENNOCK,
Hankins, Biermann, JUMPER, force plaintiffs to live in these prison
cells with other TDF patients. It is unconscienable for Defendants
to force two adult patients to live in a prison cell designed to
confine one child and;

        a). The prison cells at the TDF were initially designed
            to have one bed in each cell. When DHS took control
            over the TDF from the Illinois Dept. of Corrections,
            DHS placed an additional upper-bunk in each cell.
            The upper bunk is essentially a steel shelf affixed
            to the wall. There are no rails nor safe manner to
            get into or out of the top bunk, and;

        b). Numerous TDF patients have fallen while getting into,
            out or, or while sleeping in these top bunks. Some
            have been seriously injured including broken bones,
            head injuries, spinal injuries and other wounds.

99). Defendants named in ¶98 have known, over an extended period
of time, that Plaintiffs are being endangered by the way they are
housed at the TDF and have failed to take any corrective action
that could be undertaken including, reduction in the population so
as to avoid the over-crowding that is the reason for forced double-
celling at the TDF and, minimally; installing a safe method of
getting in; getting out of and; sleeping in the bunk. The endangerment
has been the subject of complaints, grievances and civil rights
litigation and to date, this long term endangerment remains unabated.

100). Defendants Scott, Hankins, Clayton, Biermann, JUMPER,
various John/Jane Doe Defendants, have created and enforce a policy,
that has been approved by Defendants Dimas, FREEMAN, COLEMAN, where
patients, who decline a cell-assignment, are subjected to the following; —

a). Being confronted by aggressive security staff,
forced into handcuffs behind the back and placement
into a solitary confinement, punitive prison cell,
in the segregation unit of the TDF, and;

b). Being illegally and unlawfully seperated from personal
property, including legal materials, confidential
mental health reports, clothing, electronic items,
musical instruments, personally owned food items
and other valuables, and;

c). The personal property is then, either left in the
cell with the other TDF patient for extended periods
of time or, is "packed up" by other TDF patients
and when valuable property items are reported missing
once the TDF patient (who was taken to segregation)
gets his property back and reports items missing,
per the polcies of the defendants and, the Liberty
Defendants Grievance Examiner, there is never re-
inbursement for lost and stolen property.

101). These property issues are well known to each Defendant
named in ¶98 and, the Liberty defendants, including Defendants
Jumper and Carraway.  Defendant PENNOCK has direct involvement as well.

102). The cell assignments are almost always ordered by Defendant
Hankins who, has knowingly and deliberately placed non-compatable
individuals into double-celling housing assignments.

103). Defendant Hankins, in carrying out the policies and
agendas of the Defendants in ¶98, deliberately has ordered members
of the Plaintiff Class into double celling assignments, or onto
housing units with other patients that Hankins had direct knowledge
would, create a dangerous, violent or abusive situation or, would
result in sexual abuse or exploitation, or, would result in bullying,
exploitation, intimidation and abuse. Defendant PENNOCK does the same.

104). Defendant Hankins has retaliated against TDF patients
who have filed complaints, grievances and lawsuits against him or
other TDF staff, by knowingly and deliberately ordering moves into
uncomfortable or dangerous double celling arrangements and, his
actions are in concert with the agendas, orders, policies and
rules as established by Defendants Scott, Clayton, Biermann, PENNOCK,
and various John/Jane Doe DHS defendants. Defendant Pennock does the same.

51

105). The Defendants in ¶98 have created, enacted and enforce a forced double-celling policy upon the plaintiff and other TDF detainees, --- that is illogical, internally inconsistent with the SVPCA and the civil and constitutional rights of affected persons where;

> a). Persons confined at the TDF are purportedly there because they are alleged to be too dangerous to be released into the community after having served a prison sentence for a sexual criminal conviction. The SVPCA requires that persons held at the TDF are mentally disordered and unable to control their sexually violent criminal behavior;

> b). To force the civilian detainee plaintiff into the TDF, purportedly "for treatment of a mental disorder" and, to simultaneously force those individuals into a locked prison cell with an individual the Illinois government claims is too dangerous to be released into society, is illogical, inconsistent and violates the civil, constitutional, statutory, common law and human rights of the plaintiff and other TDF patients;

106). While the dictates of Title 59 require the defendants to have a "Rooming Committee" that consists of TDF staff from security, clinical and medical departments, it is indisputeable that Defendant Hankins makes rooming decisions and that the "rooming committee" is generally, pretextual. Additionally, Hankins, as a security guard, does not possess the education or licensure to utilize the type of "professional judgment" that Title 59 seems to require.

107). That when TDF staff, have ordered the plaintiff to move into a TDF prison cell with another TDF patient that Defendant Hankins has ordered cohabitation with, in addition to being accosted by security staff (which at times has included the Tactical Assault Squad of TDF security guards, dressed in riot gear), cuffed and put into solitary confinement in the segregation unit, the TDF patient is then charged with major disciplinary rule violations. All of the foregoing policies and practices have been in-place at the TDF for several years and are widely known and routinely enforced. Defendant PENNOCK has assumed HANKINS position, and does the same.

108).   The plaintiff and other TDF patients are faced with
the ultimate "Catch-22" scenerio created by Defendants SCOTT,
CLAYTON, HANKINS, PENNOCK, and known by and approved of by Defendants
DIMAS, COLEMAN, FREEMAN, as well as the LIBERTY Defendants including
JUMPER, CARRAWAY and various JOHN/JANE DOE Liberty staff.
It is widely known and an absolute truth that dozens of TDF patients
have been seriously injured, while trying to get up to, or down from
the makeshift top bunks at the TDF. Additionally, because in addition
to no safe way up or down from the top bunk, dozens of TDF patients
have fallen out of the top bunks because they are not equipped with
any kind of safety rail or other barrier and, are extemely slippery.
Additionally, numerous violent and sexual attacks have been perpetrated
by TDF patients under forced double celling circumstances.
The defendants, especially HANKINS and PENNOCK, at the direction of
Defendants SCOTT and CLAYTON, have used forced double celling as a
form of retalliation by forcing plaintiff, and other TDF patients
into cells with known institutionally violent or sexually aggressive
TDF patients. The plaintiff, and other TDF patients are forced to
make the decision of     accept the forced double celling and risk
injury or violent/sexual assault or, be cited with rule violations,
segregation, loss of personal property and use of that rule violation
by DHS Evaluators, such as Defendants SUIRE, TRAVIS, WEITL, GASKELL
as "evidence" of mental disorder justifying longer commitment.

109). All of the foregoing facts are known to Defendants DIMAS,
FREEMAN, COLEMAN, SCOTT, CLAYTON, JUMPER, CARRAWAY, BIERMAN, SUIRE,
TRAVIS, WEITL, GASKELL and various JOHN/JANE DOE Defendants who have
all either participated in this outrageous conduct, or turned a very
deliberate blind-eye and failed to intervene or otherwise act.
The conduct of the defendants as described above, is not logically
nor rationally related to the purpose of confinement and violates
plaintiffs civil rights as well as 14th Amendment constitutionally

guaranteed rights, protections and immunities and secured by the
United States Constitution and the laws and statutes of Illinois.

110). The above prison-cell and double celling issues are
asserted in conjunction with the over-all conditions of confinemet
complaints outlined in the Introduction of this Complaint and
re-advanced and re-incorporated herein.

111). On information and belief, numerous TDF patients, (& plaintiff_),

.have filed formal complaints about the TDF's conditions
of confinement with, the Illinois Inspector General for the
Offices of the Illinois Governor; Defendants Michael Madigan;
Defendant Lisa Madigan and, in various circuit courts where
Defendants Marasco and Smiley-Blomgren were present. The grievance
procedure is an absolute exercise in futility (as pointed out by
7th Circuit Court of Appeal Judge Posner, cited hereinabove) and,
plaintiffs are left unprotected, subject to these serious forms
of state sanctioned misconduct, endangerment and violence and,
Defendants Dimas and COLEMAN, who, are the top-level IDHS administrators
governing the TDF, have failed to act.

112). That the Liberty defendants, including Jumper, Caraway,
and John/Jane Doe Liberty defendant therapists and grievance staff,
are all well aware of the foregoing policies and practices and,
have participated in, approved of, caused, or otherwise violated
well established constitutional and civil rights by repeatedly
imposing and inflicting these horrific conditions of confinement
upon the plaintiff and other TDF "civilian patients".

113). The foregoing acts and conduct, violate the United States
constitution and are in direct violation of the "least restrictive"
requirements of the SVPCA.

54

114). All of the foregoing is also known to the WEXFORD Defendants
as well as Defendant BEDNARZ who, as (former) Medical Director of
the TDF, had an absolute duty to intervene. The plaintiff will prove
at trial that all of the foregoing, in individual context and under
the totality of circumstances, constitutes violations of his civil
and constitutional rights and is not rationally nor logically related
to the purpose for which he is "civilly" confined.

## COUNT FOUR

FOR HIS FOURTH CAUSE OF ACTION against Defendants DIMAS, FREEMAN,
COLEMAN, BEDNARZ, SCOTT, JUMPER, CLAYTON, LIBERTY, JUMPER, CARRAWAY,
SUIRE, TRAVIS, WEITL, GASKELL, and various JOHN/JANE DOE Defendants,
the plaintiff claims and alleges that;

115). Plaintiff hereby readvances and reincorporates paragraphs
¶1 thru ¶114 as if they are re-stated herein.

116). The Defendants are all individually and collective and
active participants in a "sham" treatment program that is in actuality
nothing more than an extension of incarceration that has created a
secondary Illinois prison system, for profit where the Defendants
enjoy unjust and unlawful enrichment and job stability by the long-
term confinement of plaintiff and other "civilians" at the TDF who
have no current or active symptoms of any mental defect that they
cannot control. The prison-like, toxic, punitive enviornment that
has existed at the Rushville TDF imposes unconstitutional, wrongful
imprisonment upon the plaintiff in the complete absence of Due
Process where he has NOT been convicted for nor sentenced for any
criminal offense to a term of imprisonment in a state prison.
The TDF, by physical plant design and by the method and manner
it is operated, **as admitted by IDHS General Counsel, is a maximum
security prison**. The plaintiff is a United States citizen who,
under the Federal Constitution, cannot be imprisoned absent Due Process.

117). In a decided case involving the California version of
the SVPCA, the 9th Circuit Court of Appeals stated in Hydrick v.
Hunter, 449 F.3d 978, 2006 U.S. LEXIS 13497 that;

> "The State cannot have it both ways. If confinement of
> a sexually violent predator is civil for purposes of
> evaluation under the Ex Post Facto Clause, that confinement
> is civil for purposes of defining the rights to which
> the detainee is entitled while confined. [C]ivil status
> means civil status, with all the rights that accompany it."
>
> also see Jones v. Blanas, 393 F.3d 918 at 933.

As admitted by DHS General Counsel, the Rushville TDF is a maximum
security prison. The plaintiff and other TDF "patients" are not treated
nor regarded as civilian patients, but as prisoners being held for
punishment. This is the deliberate policy of the Defendants.

118). Plaintiffs and other TDF "patients",  can and will prove
at trial that the TDF is used to house criminal defendants who are
facing indictments for criminal offenses, unrelated to any conduct
occurring at the TDF. That these persons are housed with and amongst
the TDF's general population. These individuals who are later
convicted of criminal charges, are credited with the time served
at the Rushville TDF because courts in Illinois regard the TDF as
a "penal institution". That State of Illinois is "having it both
ways" where the TDF exists solely for the alleged reason of "treating
the mentally disordered souls placed at TDF for serious mental
disorders" (see generally, 725 ILCS §207.1 et seq.). The Act is
defined as "civil" (see 725 ILCS §207/20). It is in reality, "criminal".
As outlined in the foregoing paragraphs, the foundation of the
evidence used by Defendants Lisa Madigan, Joelle Marasco, Debra
Smiley-Blomgren (and their SVP-Bureau assistants), is the very
same criminal charges that were used to send the plaintiffs to
prison; Defendants Dimas, Freeman, Bednarz, Scott, Clayton, Hankins,
Biermann, COLEMAN, Liberty, Jumper, Carraway and John/Jane Doe

defendants then impose punitive imprisonment including all of
the conditions of confinement described hereinabove and; by utilizing
prison tactics, prison mentalities, prison guards, prison handcuffs
and leg irons, prison rules, a segregation unit, prison healthcare
services, prison food services, prison telephone services and then
have the unmitigated gall and audacity to claim that the TDF is
"a treatment facility".

119). "Treatment" is a sham, as evidenced by the fact that
more men have been released from the TDF in body-bags than through
the "treatment" sham being used to justify the employment and high
salaries of hundreds of A.F.S.C.M.E. union employees.

120). The TDF also creates hundreds of other related jobs that
are directly and proximately connected to the TDF including but not
limited to the DHS evaluators, the Aramark Correctional Food
Services staff; the Wexford Healthcare staff; administrative
assistants, secretaries, maintenance workers, computer specialists,
warehouse staff, peripheral human resources staff; training staff;
defense evaluators; defense lawyers; attorneys representing staff
and contractors sued for conduct related to TDF matters and, a
long line of other occupations fueled by the TDF...all thriving
because an extremely unlucky group of men have been determined
undeserving (by the defendants) of the rights, protections,
immunities and safeguards guaranteed all Americans by the U.S.
Constitution, Supreme Court Law, the laws and statutes enacted
by the legislature and as decided upon by the Illinois Supreme
Court, following the well decided decisions of the U.S. Supreme Court.

121). A simple audit of the "treatment" purporting to be
provided at the TDF will reveal the following;

a). The "treatment" being offered by Liberty, as implemented by Defendants Jumper and Caraway is completely speculative under the context of the SVPCA where, the mental disorders under the act are defined as "congenital or acquired". The Liberty defendants do not follow the requirements of the SVPCA and, 20 Il.Admin.Code §1905.240 (the elements of a comprehensive evaluation) that require "medical testing necessary for diagnosis). These medical tests have never been conducted. The Liberty defendants have no valid medical information identifying the causation of the diagnosed mental disorders. "How can they treat something if they have no knowledge of what it is?", and;

b). The diagnosis given to the plaintiff (and others at TDF), by the DHS Defendant-Evaluators, are taken exclusively from the DSM-5 (and previously, the DSM-IV-TR). The DSM does not make a single reference nor does any version of the manual define the mental disorders relevent to this case, as having "a congenital or acquired" origin. As such, the diagnosis of a "congenital or acquired" disorder is purely conjecturous, as is any purported "treatment" being offered at the TDF, and;

c). As Defendant Joelle Marasco has plead, in a motion she filed in an SVPCA case, "testimony of experts is nothing but an opinion, which may be useful when it can be corroborated by definite facts, or when it is connected with facts which may be substantiated. Jones v. Jones, 94 N.E.2d 314 (Ill. 1950). However, it cannot be allowed to prevail when there is no support for the expert's conclusions." The logical connection between Defendant Marasco's successful argument in an SVPCA case to the instant facts is, where there is nothing substantiating that Liberty is "treating" a "congenital or acquired" mental disorder then that "treatment" is a sham, a falsehood and, it is demonstrated that the "treatment" justification for confining over 550 Illinois citizens is a pretext and a pretense and the actual imprisonment is to further punish.

d). That the "treatment successes" at TDF, in the form of the limited number of TDF patients who are released on "conditional release", is an abysmal failure where 60% to 75% are returned to the TDF shortly after being placed on Liberty's "C.R. Program" in the community, and;

e). That there is no confirmed research that shows that "treatment" in any way actually reduces the probability of reoffense and, can in fact increase that probability in some cases.

f). That the "treatment" programming, as implemented
by Liberty, has caused and created mental illness
where the plaintiff (and other TDF patients) are exposed
to "shame based" ridicule; where the self-fufilling
prophecy is exemplified (where authority figures
providing "treatment" from Liberty) label, re-
enforce, and innundate "patients" with the sick
and deviant details of horrific sexual crimes
for days, weeks, months and years, in effect,
pouring gas on the fire and making the men worse
than they were when they came to the TDF, and;

g). While completely segregating plaintiffs from
the ability to function in modern society by
denying them all access to the world wide web,
data bases, Internet banking, e-mail and, creating
a "destined to fail" scenerio, where TDF patients
are alien to normal American societal functioning, and;

h). By creating a "treatment" regime that takes many
years to get through and forcing the patients to
"start over" and repeat treatment modules time
and again, basing the entire concept on prior
criminal acts (in some cases, from decades ago)
and not on current mental pain or symptology.

122). All of the foregoing demonstrate that "treatment" is
virtually non-existant, is pre-textual and is used as a catalyst
for extended imprisonment of the plaintiff (and other TDF patients), and,
as a basis to create large numbers of high paying jobs for Defendant
John Sullivan's constituants, (prior to his recent retirement.)

123). All of the foregoing, are policies, practices and procedures
that have been in-place for an extended period of time and, are
directly implemented, carried out by, contributed to or enforced
by Liberty Defendants, Jumper, Caraway, John/Jane Doe Liberty
staff and as approved of by Defendants Dimas, Freeman, Bednarz, Coleman,
Scott, Clayton, Hankins, Biermann, and various John/Jane Doe
defendants. The designer of all of the foregoing is Defendant BEDNARZ.

124). That the foregoing treatment pretextuality serves as a
pretense and a basis to cause the illegal, unconstitutional violation
of the Federal Constitution and the laws and statutes of the State
of Illinois and, is a violation of the Public Trust.

125). All of the foregoing, is an unjustified drain on the

State of Illinois economy where, private contractors are charging

Illinois taxpayers multiple millions of dollars to provide empty

services, while furthering the violation of the constitutional

rights of the plaintiff, and others held at the TDF.

> a). The reality of the matter is that in direct
> contravention of Illinois law, the private
> contractors profiting off the SVPCA, have
> created a "privatized prison" where Liberty,
> Aramark, Wexford, Securus, Trinity and various
> other corrections based private companies are
> operating the Illinois Dept. of Human Services
> Treatment and Detention Facility while only the
> security guards are actual state employees.

> b). Plaintiff will prove at trial, that;
> on information and belief, that the award of
> state contracts to the above private companies,
> has an underpinning ripe with corruption and
> financial improprieties.

126). That where the average Illinois Department of Corrections

prison operates on a budget in the average annual range of $23,000,000

to $27,000,000 and houses approximately 2,000 inmates each, the

TDF annual operating cost, to house about 550 civilian patients

at approximately $30,000,000 a year cannot be justified.

127). On information and belief defendants have knowingly,

deliberately and illegally violated the public trust by engaging

in financial malfeasance, mismanagement and misappropriations while

violating the civil and constitutional rights of plaintiff.

128). Where patients held at other IDHS facilities are not

subjected to the sham treatment models implemented by the Liberty

Defendants, even when the most profound mental disorder are being

treated, their involuntary civil confinement lasts no-where as long

as the length of time the plaintiffs and plaintiff class are confined,

thus, violating plaintiffs right to equal protection under the law.

129). Plaintiff will prove at trial, by overwhelming proof that the TDF subjects him to unlawful, unconstitutional, punitive punishment that violates the SVPCA and the prescedents that to date, have supported it. Dozens, if not hundreds of grievances and complaints about the illegal and unconstitutional conditions of confinement have been routinely ignored and/or denied by Defendants Michael Madigan, Lisa Madigan, John Sullivan, James Dimas, Anderson Freeman, Michael Bednarz, Greg Scott, Charles Clayton, Joseph Hankins, David Biermann, Sharon COLEMAN, , Liberty Health care's John/Jane Doe staff, Shan Jumper, Sharlene Caraway and various additional defendants. As will be proven at trial, at enormous cost to the Illinois taxpayers to the tune of hundreds of millions of dollars to date, the TDF is an illegal, unconstitutional prison that violates state law and the Federal  constitution. From top to bottom, the TDF is a maximum security prison that infringes upon the basic human, civil and constitutional rights of the 550-plus human beings who are being held, against their will.

### COUNT FIVE

130). Plaintiff  incorporate all previous allegations as if fully set forth herein: par's. ¶1 thru ¶129 inclusive;

131). Defendant DHS Evaluators, Kim Weitl, David Suire, Richard Travis, Steve Gaskell and numerous other JOHN/JANE DOE DHS SVPCA "evaluators",,,,,, (hereinafter "DHS Evaluators"), working in concert, conspiracy and conjunction with Defendants Michael Bednarz, Lisa Madigan, Joelle Marasco, Debra Smiley-Blomgren, have individually and collectively, created a body of law in Illinois that is founded upon unreliable, unsupported opinion that is speculative guesswork, that has and continues to cause Plaintiff and hundreds of other citizens to be wrongfully imprisoned.

The plaintiff will prove at trial that each of the DHS evaluators have falsely imprisoned, falsely diagnosed and unethically harmed plaintiff.

132). Defendant Bednarz, working in concert, conspiracy and conjunction with Defendants Lisa Madigan, Joelle Marasco, Debra Smiley-Blomgren (and their subordinate SVP-Bureau assistants), have knowingly and deliberately caused the plaintiff to be wrongfully imprisoned at the TDF based upon false and misleading psychological reports and testimony that is templated, contribed and unethical.

133). Defendant Bednarz is the person who hires, directs, trains and teaches policy to DHS Defendant Evaluators who then use the information and directions of Bednarz to cause persons to be initially committed under the SVPCA, or, causes persons already committed, to remain committed during annual "re-examinations" conducted under §207/55 of the Act.

134). The Defendant DHS Evaluators violate the SVPCA, Illinois law, their ethical requirements, and the rights of plaintiff by regularly and routinely tendering purported psychological evidence that they are unqualified or lack proper evidence to opine about. Specifically, the DHS Evaluators, opine that plaintiff "suffers" from congenital or acquired paraphilic mental disorders in the complete absence of a scintilla of evidence to support such a claim or diagnosis. This unsupported testimony is speculative and conjecturous and, has caused plaintiff to be falsely imprisoned where the testimony establishes the SVPCA statutory requirement that the plaintiffs suffer from "a congenital or acquired" mental disorder.

62

135). That the Defendant DHS Evaluators cause plaintiff' to be wrongfully and falsely imprisoned by tendering psychological reports that in this case,,,utilize nothing other than the fact that plaintiff "was" convicted of criminal offenses that took place, long before the defendants conduct "psychological exams") and use nothing other than the fact of those convictions to diagnose a "current" mental disorder, and;

> a). Defendants make diagnosis in the absence of any recent or current symptoms of mental disorder, and;
>
> b). Defendants falsely opine that having the diagnosis of a mental disorder, taken exclusively from the DSM-IV-TR or its successor, the DSM-5, automatically implies that plaintiff  suffer from an inability to control deviant sexual behavior.
>
> The DSM-IV-TR at pg. xxxiii and DSM-5 at pg. 25 specifically state that "meeting the criteria for a DSM disorder does not imply that the person is or was unable to control behavior at a particular time." and;
>
> ***C/.
>
> c). Claiming that they can predict that "as a result of the mental disorder, that it is substantially probable" plaintiff. will engage in future acts of sexual violence, by utilizing actuarial risk assessment tools that neither detect the presence of nor measure the severity of any mental disorder.", and;
>
> d). By utilizing out-dated or obsolete reliance materials, and,by failing to conform to the requirements of the elements of a comprehensive sex offender specific psychological evaluation as mandated by the SVPCA and the SOMB, 20 Ill.Admin.Code §1905.240.

136). All of the foregoing conduct was directed by Defendant Bednarz who created the methodologies and techniques currently implemented and utilized by the Defendant DHS Evaluators, and;

137). All of the foregoing has been in concert with and in conspiracy with Defendants Lisa Madigan, Joelle Marasco, Debra Smiley-Blomgren and their assistants in the SVP-Bureau.

---

***C/. Plaintiff has transcripts of Defendant's Suire and Weitl admitting under oath that the risk assessments have nothing to do with detecting the presence of or measuring severity of any mental disorder.

137). The Defendant DHS Evaluators regularly and routinely cause plaintiffs to be wrongfully imprisoned based upon their mis-use of the DSM-5 (and its predecessor, the DSM-IV-TR) by opinion and advancing the existance and legitimacy of purported mental disorders that the creators, researchers and authors of DSM-5 and DSM-IV-TR have stated have no support or scientific basis in the DSM manuals.

> a). That Defendants Lisa Madigan, Marasco and Smiley-Blomgren have knowingly and deliberately mislead courts and juries into accepting these false and unsupported diagnosis and, have caused a body of law to be created in Illinois that has absolutely no medical or scientific support. In specific, for example, the diagnosis of "Paraphilia-Not Otherwise Specified-Nonconsent" or "P-NOS";

> b). The DHS Evaluator Defendants with the above Attorney General defendants have caused the unlawful and unjustified imprisonment of numerous persons held at the TDF based upon non-existent mental disorders, and;

> c). When the chairperson of DSM-IV-TR came into an Illinois courtroom and testified under oath that P-NOS in fact does not exist, rather than take the ethical, honorable and ethical steps to relieve plaintiff from ongoing, unjustified SVPCA civil confinement based on this false and un-supported disorder, Marasco and Smiley-Blomgren doubled down and sought to discredit the DSM chairman. Then, caused a body of law to be created in Illinois where hundreds of human beings are locked up, under the SVPCA, based on this faulty concocted disorder.

> (see In the Matter of State of New York v. Jason C., 2016 WL 300519, 2016 N.Y. Slip Op. 26018) where the base invalidity of P-NOS and its successor, "O.S.P.D." were examined in depth and determined to be "not ready for prime time".

> d). Then, after the DSM-5 was released in May of 2013, the Defendant DHS Evaluators and, Marasco and Smiley-Blomgren, disingenuously started altering the diagnosis of numerous persons held at the TDF, " after they had been unjustifiably locked-up for P-NOS, in some cases, for well over a decade.

138). The DSM-5 Guidebook at page 274 confirms that all rape-based mental disorders (such as P-NOS) are not included in DSM-5.

Further demonstrating the sham, pretextuality of "treatment" and the underlying "diagnosis" forming the purported basis for "civil" detention is the basic, logical question of "if it is unknown whether a diagnosed mental disorder is "congenital or acquired", and the very manual that the purported disorders is derived from does not speak to this question, how is any effective "treatment" even possible???".

139). The Supreme Courts of both the United States and the State of Illinois have made clear that "lack of control" must be proven for SVPCA confinement to be justified. The Defendant Attorney General prosecutors have, with the assistance of the DHS Evaluator Defendants, convinced Courts in Illinois that "lack of control is implicit" in a mental disorder diagnosis. This is false.

140). The plaintiff was purportedly diagnosed (By the DHS Evaluator Defendants) by use of and reliance on the DSM-IV-TR and after 2013, by the DSM-5. The DSM-IV-TR at pg. xxxiii and the DSM-5 at page 20 state that lack of control is in fact not implicit in a DSM mental disorder diagnosis.

141). Both versions of the DSM cited above also require that an individual be symptomatic for a current mental disorder diagnosis to be made. If there are no "symptoms" and no demonstrable proof of inability to control conduct (independent of the DSM diagnosis), the only logical and actual basis for plaintiffs' confinement is to extend his incarceration under the sham pretext of "treatment". In actuality, the defendants have unlawfully and unjustly imprisoned the plaintiff (and others similarly situated), in a maximum security prison and under prison rules, in the complete absence of a properly obtained and justified criminal conviction and proper statutory sentence. All of the foregoing is known to, deliberately done and the intentional practice of each of the named defendants, individually and collectively.

## GENERAL CONCLUSORY ALLEGATIONS

142). The plaintiff (and other TDF "civilian detainees") is unlawfully and unconstitutionally being imprisoned by the Defendants in a maximum security prison, under maximum security rules that are with limted exception, identical to IDOC prison inmate rules. The TDF imposes a list of approximately 75 additional "Facility Rules", making the "civil" custody of the plaintiff, more punitive, burdensome, psychologically damaging and harsher than what prison inmates who are in state custody to be punished must abide by and live under.

143). That this is a "totality of circumstances" case where, each of the named defendants play a significant role in the creation of an unconstitutional secondary Illinois prison system that has to date avoided proper review under Ex Post Facto and Double Jeapordy Constitutional analysis.

144). That the TDF Defendants, including SCOTT, CLAYTON, HANKINS. (retired as of June 2017), PENNOCK, JUMPER, CARRAWAY and various other JOHN/JANE DOE Defendants, have a long established and documented history of retalliating against TDF "patients" who bring litigation to the Courts against TDF or Liberty staff. Numerous retalliation claims have been and are currently pending before this very Court, against the very same Defendants listed and named in this Complaint.

145). Plaintiff expresses fear for his physical, mental and general well being as well as his property rights as a result of all but certain retalliation against him for bringing this lawsuit.

146). The TDF is a modern-day death camp. In fact, in March of 2017, Defendant Clayton, TDF Security Director gave an interview to a reporter for the Rushville Times Newspaper and stated that "the majority of the TDF's residents will live out their lives" within the confines of the Facility. While this fact has been well known to the plaintiff and other TDF detainees' for a long time, the

candid admission by a TDF Administrator is a compelling insiders view of what the TDF is actually and honestly in-place to do,,,e.g., "lock the plaintiff up until he dies" and, "to provide high paying and stable employment for the employee's at the TDF".

147). The manner in which the plaintiff has been civilly committed, rests entirely upon nothing more than the fact that he was criminally convicted. The manner in which he is confined is nothing short of an extension of his already fully completed criminal sentence under the very thin veiled justification of a "civil" Act. The SVPCA is in fact located squarely within the Illinois Criminal Code; it requires a criminal conviction as a pre-requisite element for commitment and, requires that the plaintiff be placed in a Department of Corrections prison. (see generally, 725 ILCS §207/5(f) and §207/50)).

The manner in which the TDF is operated and the way in which the defendants operate it, cannot with-stand any level of scrutiny and the plaintiff asserts that the time has long-passed for the Federal Courts to enforce the United States Constitution.

148). The plaintiff moves and motions this case to be placed on the Court's accellerated docket;

## RELIEF REQUESTED

The plaintiff hereby moves for the following Declaratory and Injunctive Relief, on an emergency basis, including but not limited to;

a). A finding that the Rushville TDF operates as a puntive, maximum security prison imposing punitive conditions of confinement upon the Plaintiff and other persons similarly situated, and; That all Defendants including WEXFORD and ARAMARK have created a toxic, punitive, correctional facility enviornment at the TDF, and;

b). A finding that the Rushville TDF operates in a punitive, prison-like manner that is not logically nor rationally related to the purpose for which the plaintiff (and other civil detainees) is/are held for, and;

c). A finding that Defendnats DIMAS, FREEMAN, COLEMAN, BEDNARZ, SCOTT, CLAYTON, HANKINS, PENNOCK, BIERMAN, JUMPER, CARAWAY and various JOHN/JANE DOE LIBERTY defendants, have knowingly, intentionally and deliberately violated the civil, constitutional and state law rights of the plaintiff by imposing upon him conditions of confinement that impose(d) punishment similar to or harsher than conditions imposed upon prison inmates, and;

d). That Defendants Lisa MADIGAN, Joelle MARASCO, Debra SMILEY-BLOMGREN and various JOHN/JANE DOE Assistant Attorneys General, have conspired with or otherwise caused Defendants BEDNARZ, SUIRE, TRAVIS, WEITL, GASKELL and other various JOHN/JANE DOE DHS Evaluator defendants to formulate methods of psychological evaluation that were slanted, biased and designed to cause the plaintiff (and other civilians held at TDF) to be diagnosed with mental disorder(s) that caused or continued civil detention at TDF despite the absence of mental disorder symptoms or a disorder that causes an actual "inability to control sexual behavior" and, in so doing, violated the plaintiffs civil and federal constitutional rights resulting in unlawful imprisonment, stigma of improperly diagnosed mental illness and, deprived plaintiff the right to liberty, freedom of familial association, earnings, travel, and other freedoms guaranteed by the Constitution, and;

e). That the Court find that the DHS Evaluator Defendants have unethically, illegally, deliberately and in concert with other defendants, have willfully and knowingly engaged in unjust enrichment by in effect "selling their licensure" and allowing their diagnostic conclusions to be slanted in the direction of the agendas of Defendants LISA MADIGAN, JOELLE MARASCO and other JOHN/JANE DOE Assistant Atty. General Defendants who used that "purchased opinion" to cause the unlawful and unjust false imprisonment of the plaintiff and, other individuals civilly imprisoned at the TDF, and;

f). That the Court declare that the defendants, have in concert and, individually, created an illegal and unconstitutional "secondary prison system" that can no longer be declared or justified by a "civil" label, and, that in so doing, each defendant has individually and collectively violated the civil, constitutional and state law rights of the plaintiff, and other TDF "civil" detainees', and;

g). That the TDF has been used to house persons who were under criminal felony indictment or who had criminal charges pending against them when they were admitted to the TDF, and;

h). That various Illinois Courts, including the Circuit Courts' of Cook, Will and Schuyler Counties have ordered jail/prison time credits for persons held in pre-trial confinement at the Rushville TDF, and;

i). That Defendants DIMAS, FREEMAN, COLEMAN, SCOTT, CLAYTON, BIERMAN, HANKINS, PENNOCK and various TDF John/Jane Doe Defendants, and LIBERTY as well as Defendants JUMPER, CARRAWAY and various JOHN/JANE DOE Liberty Defendants have individually and in concert, deliberately imposed unlawful punishment upon the plaintiff (and other TDF "civil" detainees) that was not the product of professional judgment but was instead, in furtherance of the TDF's punitive, prison-like enviornment and policies that were not logically nor rationally related to the purpose for which plaintiff is confined and, in so doing, violated, ignored and imposed punishment in violation of the state law statutory mandate to provide the least restrictive conditions of confinement as mandated by 725 ILCS §207/40(b)(2), and;

j). That defendants SUIRE, TRAVIS, WEITL, GASKELL and various JOHN/JANE DOE DHS Evaluator Defendants, did not possess the education nor licensure to diagnose medical conditions, yet, violated the plaintiffs' civil and constitutional rights by doing so and, directly and proximately caused plaintiffs' unlawful and unjust punitive confinement, and;

k). That the DHS Evaluator Defendants (named in ¶j above), diagnosed plaintiff and others also confined at TDF with mental disorders in the complete absence of any current symptoms or evidence of any current mental illness so severe that the plaintiff (or others also held at TDF) could not control themselves, thus directly and proximately resulting in plaintiffs' unlawful, unjust and long term punitive confinement, and;

l). That the DHS Evaluator Defendants (named in ¶j above), operated on the instruction, direction and template (for diagnosis) as guided and designed by Defendant BEDNARZ and Defendants LISA MADIGAN, JOELLE MARASCO, DEBRA SMILEY-BLOMGREN and various JOHN/JANE DOE Assistant Attorneys Generals who prosecuted plaintiff (and others) under the SVPCA, and;

69

m). That the LIBERTY Defendants, including but not limited
to LIBERTY, JUMPER, CARRAWAY and other JOHN/JANE DOE
LIBERTY defendants, obtained unlawful and unjust en-
richment by carrying out a "sham" treatment program
that was, known to all Defendants to be nothing more
than a pretext to bilk the taxpayers out of millions o
dollars where there is no "actual" nor realistic need
to "treat" non-symptomatic individuals and, where the
sham treatment is deliberately slow and, coompletely
speculative where IT IS IMPOSSIBLE TO "TREAT" PLAINTIFF
(or others at TDF) NOT KNOWING IF THE ALLEGED MENTAL
DEFECT OR ABNORMALITY IS "CONGENITAL OR ACQUIRED", OR
NEITHER, and;

THAT THE COURT ENTER THE FOLLOWING INJUNCTIVE RELIEF ON AN EMERGENCY
BASIS, OR WITHIN A REASONABLE AND FEASABLE TIME AS FOLLOWS:

n). That the Court Order that all control over the person
of the plaintiff, be transferred to Federal authorities
for a period of time until otherwise ordered by the
Court and;

o). That the Court Order that the plaintiff, and other
civilians held at the TDF, be psychiatrically
evaluated by medical doctors who are completely
independent of the TDF, WEXFORD, LIBERTY, THE ILLINOIS
ATTORNEY GENERALS OFFICE and THE STATE OF ILLINOIS
to determine;

1). Is the Plaintiff suffering from a congenital
mental disorder and if so, the severity of
any such congenital condition, and;

2). If the plaintiff is suffering from an acquired
mental disorder and if so, the severity of any
such acquired mental disorder, and;

3). If the plaintiff suffers from a mental disorder
that is so severe that he cannot control his
sexual behavior, and;

4). That any other applicable, logical or other
determinations be made by independent medical
doctors be ordered and, reported to this Court, and;

p). That the Court enjoin the Defendants from continuing
to impose unconstitutionally punitive, prison-like
conditions of confinement upon the plaintiff, and;

q). That the named defendants be forever enjoined from
having any contact, authority over, involvement with,
custody over, decision-making authority or imput or
any other involvement, direct or peripheral, over the
person of or matters related to the plaintiff, and;

r). As to each defendant, an amount in punitive damages, not less than $500,000 (FIVE HUNDRED THOUSAND DOLLARS) or any further amount as deemed appropriate as to each defendant, and;

s). As to each defendant, an amount in compensatory damages not less than $500,000 (FIVE HUNDRED THOUSAND DOLLARS) or any other further amount as deemed appropriate as to each defendant, and;

t). As to each defendant, a seperate and distinct determination as to personal financial awards, to send a message to these Defendants that they have personal accountability and cannot thumb their noses at the law openly stating their lack of concern over TDF plaintiff litigation because "the taxpayers have to pay any awards", and;

u). To whatever extent lawfully allowed, that each license holder who has been found culpable of ethical or civil rights violations against the plaintiff, be ordered to personally pay the plaintiff an amount not less than $500,000 dollars in punitive damages and, $500,000 in compensatory damages, in addition to the relief requested hereinabove, and;

v). That the Court award any and all other punitive, compensatory, declaratory and injunctive relief as determined fair and proper.

**JURY TRIAL REQUESTED**

> The plaintiff herein states under penalty of law that the claims and allegations set forth herein, are true and correct in substance and fact unless stated on information and belief upon which there is a good faith basis;

BY: _____

Plaintiffs Name/Address
(PRINTED)

JOSEPH SUNDLING _____ _____

17019 County Farm rd. ___ _____

Rushville, Il 62681 _____ ___



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
OFFICE OF THE CLERK

# RUSHVILLE
## SCANNING COVER SHEET

### Notice – Please read and carefully follow these instructions:

1. Each pleading must have this cover sheet on top.
2. Each pleading must be legible. Typed, double-spaced pleadings are preferred.
3. All pages must be numbered.
4. Each pleading must be scanned separately as one complete document. A pleading may not be scanned page by page. If the pleading is more than 25 pages, then the pleading must be scanned and submitted in multiple emails with a maximum size of 25 pages. The subject line of each email should specify the range of pages included within. (For example, a 40 page pleading would be broken into 2 emails, the first with a subject line "Email 1 of 2 – Pages 1-25" and the second with a subject line of "Email 2 of 2 – Pages 26-40".)
5. Discovery requests and responses are not filed with the Court unless they are part of a motion to compel. Discovery requests and responses shall not be electronically filed per Local Rule 26.3. However, a Certificate of Service may be scanned stating you have served your discovery documents on the other parties in the case.
6. Only lines and boxes included on this form should be filled out. Do not provide any other information regarding your pleading on this Scanning Cover Sheet.

### Please complete the following (Print):

Date:   8.9.17

Name:   Sindling v. Dimas et al

Case Number: _____  ☒ (Check here if this is a new case)

### Type of Pleading (Check only one):

☐ Motion / Petition

☐ Response / Reply

☐ Other (Specify)   CIVIL RIGHTS COMPLAINT

Title of Pleading: _____
(For Example, "Motion to Compel" or "Response to Summary Judgment")

Number of Pages for this Pleading (Not Including Scanning Cover Sheet):   15

1 to 15



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
OFFICE OF THE CLERK

## RUSHVILLE
## SCANNING COVER SHEET

### Notice – Please read and carefully follow these instructions:

1. Each pleading must have this cover sheet on top.
2. Each pleading must be legible. Typed, double-spaced pleadings are preferred.
3. All pages must be numbered.
4. Each pleading must be scanned separately as one complete document. A pleading may not be scanned page by page. If the pleading is more than 25 pages, then the pleading must be scanned and submitted in multiple emails with a maximum size of 25 pages. The subject line of each email should specify the range of pages included within. (For example, a 40 page pleading would be broken into 2 emails, the first with a subject line "Email 1 of 2 – Pages 1-25" and the second with a subject line of "Email 2 of 2 – Pages 26-40".)
5. Discovery requests and responses are not filed with the Court unless they are part of a motion to compel. Discovery requests and responses shall not be electronically filed per Local Rule 26.3. However, a Certificate of Service may be scanned stating you have served your discovery documents on the other parties in the case.
6. Only lines and boxes included on this form should be filled out. Do not provide any other information regarding your pleading on this Scanning Cover Sheet.

### Please complete the following (Print):

Date: 8.9.17

Name: Sindling -v- Dimas et al

Case Number: _____  ☒ (Check here if this is a new case)

### Type of Pleading (Check only one):

☐ Motion / Petition.

☐ Response / Reply

☐ Other (Specify)  CIVIL  RIGHTS  COMPLAINT

Title of Pleading: _____
(For Example, "Motion to Compel" or "Response to Summary Judgment")

Number of Pages for this Pleading (Not including Scanning Cover Sheet):  15

16 to 30



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**OFFICE OF THE CLERK**

# RUSHVILLE
## SCANNING COVER SHEET

### Notice – Please read and carefully follow these instructions:

1. Each pleading must have this cover sheet on top.
2. Each pleading must be legible. Typed, double-spaced pleadings are preferred.
3. All pages must be numbered.
4. Each pleading must be scanned separately as one complete document. A pleading may not be scanned page by page. If the pleading is more than 25 pages, then the pleading must be scanned and submitted in multiple emails with a maximum size of 25 pages. The subject line of each email should specify the range of pages included within. (For example, a 40 page pleading would be broken into 2 emails, the first with a subject line "Email 1 of 2 – Pages 1-25" and the second with a subject line of "Email 2 of 2 – Pages 26-40".)
5. Discovery requests and responses are not filed with the Court unless they are part of a motion to compel. Discovery requests and responses shall not be electronically filed per Local Rule 26.3. However, a Certificate of Service may be scanned stating you have served your discovery documents on the other parties in the case.
6. Only lines and boxes included on this form should be filled out. Do not provide any other information regarding your pleading on this Scanning Cover Sheet.

### Please complete the following (Print):

Date: _8.9.17_

Name: _Sindling - v - Dimas et al_

Case Number: _____ ☒ (Check here if this is a new case)

### Type of Pleading (Check only one):

☐ Motion / Petition
☐ Response / Reply
☐ Other (Specify) _CIVIL RIGHTS COMPLAINT_

Title of Pleading: _____
(For Example, "Motion to Compel" or "Response to Summary Judgment")

Number of Pages for this Pleading (Not including Scanning Cover Sheet): _15_

_31 to 45_



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
OFFICE OF THE CLERK

## RUSHVILLE
## SCANNING COVER SHEET

### Notice – Please read and carefully follow these instructions.

1. Each pleading must have this cover sheet on top.
2. Each pleading must be legible. Typed, double-spaced pleadings are preferred.
3. All pages must be numbered.
4. Each pleading must be scanned separately as one complete document. A pleading may not be scanned page by page. If the pleading is more than 25 pages, then the pleading must be scanned and submitted in multiple emails with a maximum size of 25 pages. The subject line of each email should specify the range of pages included within. (For example, a 40 page pleading would be broken into 2 emails, the first with a subject line "Email 1 of 2 – Pages 1-25" and the second with a subject line of "Email 2 of 2 – Pages 26-40".)
5. Discovery requests and responses are not filed with the Court unless they are part of a motion to compel. Discovery requests and responses shall not be electronically filed per Local Rule 26.3. However, a Certificate of Service may be scanned stating you have served your discovery documents on the other parties in the case.
6. Only lines and boxes included on this form should be filled out. Do not provide any other information regarding your pleading on this Scanning Cover Sheet.

### Please complete the following (Print):

Date:   8.9.17

Name:   Sindling - v - Dimas et al

Case Number:   _____   ☒ (Check here if this is a new case)

### Type of Pleading (Check only one):

☐ Motion / Petition
☐ Response / Reply
☐ Other (Specify)   CIVIL   RIGHTS   COMPLAINT

Title of Pleading:   _____
(For Example, "Motion to Compel" or "Response to Summary Judgment")

Number of Pages for this Pleading (Not Including Scanning Cover Sheet):   15

46 + 60



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
OFFICE OF THE CLERK

## RUSHVILLE
## SCANNING COVER SHEET

### Notice – Please read and carefully follow these instructions:

1. Each pleading must have this cover sheet on top.
2. Each pleading must be legible. Typed, double-spaced pleadings are preferred.
3. All pages must be numbered.
4. Each pleading must be scanned separately as one complete document. A pleading may not be scanned page by page. If the pleading is more than 25 pages, then the pleading must be scanned and submitted in multiple emails with a maximum size of 25 pages. The subject line of each email should specify the range of pages included within. (For example, a 40 page pleading would be broken into 2 emails, the first with a subject line "Email 1 of 2 – Pages 1-25" and the second with a subject line of "Email 2 of 2 – Pages 26-40".)
5. Discovery requests and responses are not filed with the Court unless they are part of a motion to compel. Discovery requests and responses shall not be electronically filed per Local Rule 26.3. However, a Certificate of Service may be scanned stating you have served your discovery documents on the other parties in the case.
6. Only lines and boxes included on this form should be filled out. Do not provide any other information regarding your pleading on this Scanning Cover Sheet.

### Please complete the following (Print):

Date: 8.9.17

Name: Sindling v. Dimas et al

Case Number: _____  ☒ (Check here if this is a new case)

### Type of Pleading (Check only one):

☐ Motion / Petition

☐ Response / Reply

☐ Other (Specify) CIVIL RIGHTS COMPLAINT

Title of Pleading: _____
(For Example, "Motion to Compel" or "Response to Summary Judgment")

Number of Pages for this Pleading (Not including Scanning Cover Sheet): 11

61 to 71